FARRELL et al. v. PORT JOHNSTON TOWING CO.

(District Court, S. D. New York. October 3, 1907.)

1. TOWAGE—SINKING OF TOW—NEGLIGENT TOWING.
Evidence considered, and *held* to sustain the contention of a libellant that an injury to the bottom of a barge while she was in tow alongside of a tug was caused by her being towed on rocks outside of the channel in the Kills, and that the owner of the tug was liable therefor.

2. SAME—NONPERFORMANCE OF TOWING CONTRACT—DEFECTIVE APPLIANCE.
A towing company, which undertook to deliver in port a barge which had filled and had been beached, using two tugs for the purpose, but which in fact furnished but one tug, whose pumping apparatus was so defective that it broke and the barge again filled and sank before reaching the wharf to which it was being taken, *held* liable for the consequent damage.

In Admiralty. Suit for injury of tow.

Alexander & Ash, for libellants.

Carpenter, Park & Symmers, for respondent.

ADAMS, District Judge. This action was brought by William Farrell and others, the owners of the barge Atlas and a cargo of some 353 tons of coal laden on board, and Jacob Arends, the master of the said boat, to recover from the Port Johnston Towing Company the damages, said to amount to $1,600, caused by the sinking of the Atlas on the 23rd of October, 1905, while in tow on the starboard side of the respondent's tug Wilkesbarre. The tow was bound from Port Johnston, New Jersey, to the foot of Barrow Street, North River, New York, and in coming through the Kills commenced to leak and subsequently sank off St. George, Staten Island. The Wilkesbarre also had in tow, on her port side, the Lehigh and Wilkesbarre barge No. 30 laden with coal.

The account of the matter given by the libellant substantially is, that the tow came up through the Kills on the New Jersey side of mid-channel until it reached a point between West Brighton and St. George, when it crossed over to the Staten Island side in order to get the benefit of the slack water there; that in proceeding it navigated too close to Staten Island, causing the Atlas to strike a reef of rocks which gouged and penetrated the planks in her bottom but did not cause her to sink immediately, though it broke the towing line. The master was at the time in the cabin and felt the rocks grinding the bottom; that he ran out on deck, assisted in making another line fast, then sounded his pump and found the boat had already made 3 or 4 feet of water and was rapidly filling; that he immediately informed the master of the tug who, to save the vessel from sinking in deep water, put her on the beach, as stated, off St. George, where she was nearly covered by water with the rising of the tide.

The version of the matter given by the respondent is that the Atlas was not towed out of the channel nor brought in contact with the ground till she was necessarily beached near St. George; that the towing line parted about a mile from the starting place and another was put out in its place and the tow proceeded in the middle of the Kills until near St. George when the master of the tug noticed the Atlas was low

in the water and called the attention of her master to the fact; that the boat was then sounded and found to be in a dangerous condition from the amount of water she had taken in and was beached, with the assent of her master, off St. George.

The testimony is so conflicting that it is extremely difficult to determine what the facts in the case were. The master of the Atlas was apparently a straightforward witness but is subject to the criticism that he was interested in the recovery. On the other hand, no witness appeared for the tug but the master and the others on board, particularly the deck hand on duty, were not very well accounted for. There was one apparently disinterested witness called by the respondent, that was the master of No. 30, the boat on the other side of the tug, but his testimony, assuming it to have been truthful, does not throw very much light upon the matter. It appears, however, without substantial contradiction, that the Atlas was in good seaworthy condition when the towing commenced and that after the accident her bottom was severely injured and in such way as to indicate that she received the damage while towing in the Kills. The respondent alleged in its answer that the Atlas was unduly loaded and suggests an unknown obstruction but neither contention is supported by the testimony; in fact it is stated therein that the cause of the sinking was swells from a large passing steamer, but that is not credible. The barge having started from Port Johnston in a seaworthy condition and no adequate explanation having been given by the respondent of the damage to the barge's bottom and the master's explanation sufficiently accounting for the injury, I think the libellants' contention that she was towed on rocks outside of the channel in the Kills must prevail. It is urged by the respondent that the damage could have been received when she was beached off St. George, but it does not sufficiently appear that the bottom there was in a condition to produce the damage. Reference is made to the chart where the outside of the channel in the vicinity of the place where she was beached is marked "hrd" but that may mean hard sand. The testimony of libellants' witness Peterson, who had had considerable experience in the Kills, was that at the place of the beaching "it is a nice soft bottom; vessels and boats lay there every day in the week with thousands of tons on them." Upon the whole I conclude that the libellants have maintained the burden of proof.

Another question in the case was with reference to what took place after the beaching. The libellants urge that the respondent undertook to deliver the boat at Barrow Street with the tugs Coleraine and Hoffman but actually sent only the former and her pumping apparatus broke down before the destination was reached, with the consequence that she was not able to keep the Atlas free from water and she sunk just outside of the place she was bound to. The testimony sustains this contention. The Coleraine was using her syphon in the operation and it appears that it was defective by reason of having a hose connection which was unsound. It is claimed that this was a latent defect but such is not established. In the answer it is alleged that the towage to New York and pumping en route were to be done by two tugs, the Coleraine and Hoffman, but in fact no attempt was made to send the latter. If the Hoffman had been used as well

as the Coleraine, it is probable that the sinking would not have occurred. But if it be assumed that the Coleraine alone was ordinarily sufficient to deliver the boat at Barrow Street, in undertaking this venture, which required constant pumping, it should have been seen to that her apparatus for that purpose was in good order. It turned out that it was not in a condition to do this work throughout the venture, owing to the rubber hose bursting near the syphon. With the exercise of ordinary care such a result could have been anticipated because it had a visible "bad spot" at the place, which was known to those managing the tug. I find that the defect was not latent but should have been known to exist. It was sufficiently obvious to require more than ordinary care on the part of the respondent in using her for this purpose.

Decree for the libellants, with an order of reference.