## GORMLEY v. THOMPSON–LOCKHART CO.

(District Court, E. D. Pennsylvania. June 6, 1916.)

### No. 41 of 1915.

1. TOWAGE ☞11(1)—TUG UNDER CHARTER—RESPONSIBILITY FOR ACTS OF MAS-
TER AND CREW.

The owner of a tug who charters its use for towing furnishing the mas-
ter and crew is responsible for their acts within the scope of their em-
ployment.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21;
Dec. Dig. ☞11(1).]

2. TOWAGE ☞11(1)—TUG UNDER CHARTER—INJURY TO TOW.

Libelant chartered the services of his tug to tow respondent's lighters.
The master was in charge of its management, and was given directions
by respondent only as to the destination of the lighters and general orders
to take them in tow only when he thought it safe. Having been directed
to tow a lighter to a certain place, he started in the morning when there
was thin ice on the river, but instead of following the usual custom in
such cases and towing the lighter astern to avoid danger from the ice,
he towed it alongside. The seams were cut by the ice, and he ran it
ashore, where it rested on the bottom. Respondent was obliged to remove
the cargo, raise the lighter, and have it docked and repaired. *Held*, that
all such expense resulted proximately from the master's negligence, and
that libelant was liable therefor.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21;
Dec. Dig. ☞11(1).]

3. TOWAGE ☞4—INJURY TO TOW—CARE REQUIRED OF TUG.

That the lighter was old and not sheathed did not relieve the master
from responsibility, but rather required him to exercise the greater care.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. ☞4.]

In Admiralty. Suit by George W. Gormley against the Thompson-
Lockhart Company. Decree for libelant, less amount of set-off.

Willard M. Harris, of Philadelphia, Pa., for libelant.

George Quintard Horwitz, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. The libelant sues to recover a bal-
ance of $577.86, with interest from June 17, 1915, under a parol char-
ter party with the respondent for the charter of the tug Helen made
on December 31, 1914, to tow respondent's barges on the Schuylkill
river.

The answer does not deny that the balance claimed for services of
the Helen is correct and was earned, but claims a set-off for damage
to the respondent's Lighter No. 6 alleged to have been caused by the
negligence of the master of the Helen. There was a dispute between
the parties as to the terms of the charter party, the respondent claim-
ing, and the libelant denying, that they were fixed by a letter to the
libelant, proposing terms accepted and acted upon by him for the year
1913, and that the same terms were continued during 1914. The letter
in question contained the following condition:

"You are to be held liable for any damages or accidents to person or prop-
erty (without regard to ownership) caused by your negligence or the negligence
of your men during the fulfillment of this contract."

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

I think it is immaterial whether the agreement for the year 1913 in the letter was continued for the year 1914 or not. A charter party may be by parol. James v. Brophy, 71 Fed. 310, 18 C. C. A. 49.

[1] In the present case the libelant, who is the owner, did not charter his bare tug leaving the charterer to furnish the crew, but he chartered the use of his tug, furnishing the crew himself, the respondent advancing in part the wages of the crew and cost of the coal, which were deducted from the charter money. The tug was operated by the libelant's crew and in charge of a master employed by him. The master and crew, being employed by the libelant, were his agents, and he is responsible for their acts within the scope of their employment. The Nicaragua (D. C.) 71 Fed. 723; Bramble v. Culmer, 78 Fed. 497, 24 C. C. A. 182.

[2] The respondent took no responsibility for the management of the tug, merely giving orders for the destination to which its lighters were to be towed.

On the morning of December 16, 1914, there had been an overnight freeze on the Schuylkill river, causing a coating of thin ice, which the witnesses described as "window-glass" ice. The night before, the master of the Helen had orders from the respondent to take Lighter No. 6 down the Schuylkill river from Fairmount to Penrose Ferry. The master was under general directions from the respondent only to take its lighters in tow when he thought it was safe. There is no evidence that on the 16th of December the master of the tug notified the respondent of any danger to navigation, or that the frozen condition of the river was known to it. From the testimony, it appears that "window-glass" ice, such as coated the river upon that day, causes danger to a lighter, in that the thin ice is likely to get into the seams between the planking and cut out the caulking. The tug was run down the river to about Market street bridge, breaking the ice, and then was brought back after the lighter. It was lashed to the port side of the tug, and the tug and her tow proceeded down the river. When the Walnut Street bridge was reached, it was discovered that the lighter was listing to port and taking in water rapidly. The master of the tug beached her on the east side of the river, and, after some time, began pumping her out, but did not succeed in keeping her afloat or preventing her lying on the bank and bottom of the river. It was found that the ice had cut through the seams, and, in order to have the lighter repaired, it was necessary for the respondent to engage the services of a hoister to move and take away the cargo. She was then taken down the river and towed to a shipyard, where it was found that it was necessary to repair the planking, where it had been cut and where it had been strained by the weight of the water and cargo while beached, and to recaulk the bottom and sides.

The respondent claims as a set-off the costs of unloading, raising, and repairing the lighter, the expense of a watchman, the towage for pulling her off shore, docking her, and towing her to the shipyard for repairs, and demurrage covering 22 days at $6 a day. It is established from the testimony that in towing through window-glass ice, it is customary and usual, in order to avoid the danger of the ice cutting

through the seams, to tow a lighter astern instead of alongside. The injury caused to the barge was clearly due to the negligence of the master of the tug in towing the lighter through the thin ice contrary to the custom which is a rule of safety. If, upon finding the lighter in a sinking condition, prompt measures had been taken with proper pumping equipment, no doubt the heavy expense to the respondent could have been avoided. When the boat was beached, however, the master of the tug did not take any action to lighten her by pumping out the water until she was resting upon the bottom, and his pump and siphon did not effectually accomplish the work. His negligent act in his manner of towage was the proximate cause of the sinking of the lighter and the straining of her seams, which rendered necessary the general expense of caulking both sides and bottom. It does not appear that any unnecessary expense was incurred to put the lighter in navigable condition, and the libelant must bear the burden of the want of reasonable skill and care on the part of the master, which subjected the lighter to the hazard of the thin ice. The Britannia (D. C.) 148 Fed. 495; The R. C. Townsend (D. C.) 140 Fed. 217; Farrell v. Port Johnson Towing Co. (D. C.) 156 Fed. 871.

[3] The master was not relieved of his duty to exercise ordinary care, but rather required to exercise additional caution by reason of the fact that the lighter was, to his knowldge, old and unsheathed, and therefore more liable to damage from the ice. The Syracuse (D. C.) 18 Fed. 828.

The owner of the tug is liable for the cost of unloading, raising, and repairing the lighter, and for demurrage, if properly proved. O'Hare v. The Brilliant (D. C.) 3 Fed. 719; Leech v. Steamboat Miner, 1 Phila. (Pa.) 144.

The respondent has not established by sufficient proof any damage justifying the item claimed for demurrage for 22 days' detention at $6 a day, amounting to $132. There is no evidence showing the usual earnings of the vessel per diem, nor what it would have cost to employ a substitute during the detention, nor that there was employment for the vessel during that time.

There are numerous other items, such as pay for a ship's carpenter, a watchman, "expense sundries" and towing, which are not shown by any legal evidence to have been incurred by reason of the sinking of the lighter. The libelant testified in rebuttal that the towage was done by his boat, and that his lighter took the place of respondent's Lighter No. 6. The only items as to which proper proof was offered were the items for unloading, amounting to $43.75, and repairs, $300.26.

Under the condition of the proofs, therefore, the respondent will be allowed as a set-off the expenses of repairs, $300.26, and of unloading, $43.75, making a total of $344.01.

A decree will be entered in favor of the libelant for the amount of his claim, $577.86, less the amount of respondent's set-off allowed, $344.01, leaving a balance of $233.85, with interest from June 18, 1915, the date of the last item of account between the parties under the charter party.