### THE HARRIS NO. 2.

### THE RUSSELL NO. 20.

### HARRIS STRUCTURAL STEEL CO., Inc., v. S. C. LOVELAND CO., Inc., et al.

### S. C. LOVELAND CO., Inc., v. HARRIS STRUCTURAL STEEL CO., Inc.

#### Nos. 16284, 16430.

District Court, E. D. New York.

May 18, 1942.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagen, Jr., of New York City, of counsel), for libelant.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for S. C. Loveland Co., Inc.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for Russell Bros. Towing Co., Inc.

GALSTON, District Judge.

These two causes were tried together pursuant to stipulation.

On February 15, 1941, the scow Harris No. 2, with cargo and equipment, sank while being towed by a Russell tug from Reedy Point, Delaware, to New York City. A few days before, the scow had been towed from Pope's Creek, Maryland, to Reedy Point by one of the Loveland tugs without incident.

The Harris Structural Steel Company, as owner of the scow or lighter and of the material and equipment laden thereon, bases its libel on a contract made February 3, 1941 with the respondent, S. C. Loveland Co., Inc., for the towage of the lighter from Pope's Creek, Maryland, to New York, at an agreed price of $700, the towage to be performed at the convenience of Loveland.

The tow arrived at Reedy Point on February 11, 1941 at about 3 o'clock P. M. On February 12, the Russell Bros. Towing Co., Inc., notified the Harris Structural Steel Company that it had been hired by Loveland to perform the towage from Reedy Point to New York, and that it was necessary for libellant to give a release of liability. It is alleged by the libellant that no release was given either to Russell or to Loveland, but that in view of the request for a release, the libellant sought to obtain insurance on the lighter; that as a consequence of its application for insurance a surveyor representing maritime underwriters was sent to Reedy Point where an examination was made by him on February 14, 1941; and on February 14, 1941 that he reported to the underwriters that the lighter was not in seaworthy condition to undertake the voyage to New York. The surveyor, it is alleged, also informed the captain of the tug Russell No. 20 of his report, and it is further alleged that the surveyor's report did not reach the Harris Company in New York until February 15, and in consequence the libellant did not obtain the insurance on the lighter. Fault is alleged in that despite the fact that those in charge of the tug Russell had been advised of the unseaworthiness of the lighter, the tug nevertheless set out from Reedy Point at 8 A. M. on February 15 without awaiting further instructions and affording the libellant an opportunity to make the latter seaworthy.

Additional fault is alleged that the towage was commenced in the face of adverse weather conditions; that the Russell failed to turn back but continued in the face of

adverse weather conditions; that she failed to anchor; failed properly to maneuver to reach Lewes, Delaware, and that the tow was improperly made up in that the lighter B-9 and Harris No. 2 were made fast alongside the tug instead of on hawsers astern.

It is important first to determine whether the contract made between the Harris and Loveland companies was a "no liability" tow. As is not unusual in these towage cases, there was no written contract. Apparently a representative of the Harris Company called on Maguire, the secretary and manager of Loveland, and said he wanted these boats delivered to the new owner, and asked for a price for the service sought. Maguire told him that the Loveland Company was not in position to tow them "outside" but that the Loveland Company would take the first leg of the journey and tow the boats from Pope's Creek to Reedy Point, and that he would engage another towage company to complete the towage from that terminal. Maguire suggested the Russell Towing Company, which was agreeable to Schneir, the representative of the Harris Company. It may be noted that on other occasions Loveland had towed for the Harris Company between Philadelphia and the Potomac River on agreements that relieved the tug boats from responsibility for damage to the scows or their equipment, and that such undertakings were always made with Schneir. After Schneir's first visit, and before the contract was entered into, Maguire conferred with Russell to see whether the Russell Company was agreeable to undertaking the outside towage, i. e., the second leg. The Russell Company insisted on a non-liability towage, and Maguire informed Schneir accordingly, stating: "We must be released of all responsibility in towing and I insist upon a letter from you." To which Schneir is reported to have said: "I will send you that letter." It appears that on previous occasions Maguire had not required a letter from Schneir, but he explained that on this occasion it was because Russell had insisted on obtaining such a written release that he had demanded it. Whatever the precise words employed in the conversation, the inference from all the surrounding circumstances is clear that the Harris Company had agreed on a no liability tow, and in addition, at the request of Russell, had agreed to send a letter confirming that agreement. The letter was not furnished, but without the letter the oral undertaking was in itself sufficient. It cannot be argued convincingly that the oral agreement was merely to give a written release. On the contrary, the release was oral. The letter was not to be a formal instrument expressing any new or additional consideration. On the other hand, it is not clear just how broad or definite the release was to be. However, in no event would the tug be released from liability for damage caused by its own negligence unless expressly so covenanted. The Syracuse, 12 Wall. 167, 20 L.Ed. 382; The M. J. Cummings, D.C., 18 F.178; The Rescue, D.C., 24 F. 190; The American Eagle, D.C., 54 F. 1010; The Jonty Jenks, D.C., 54 F. 1021; In re Moran, D.C., 120 F. 556; The Somers N. Smith, D.C., 120 F. 569; Alaska Commercial Company v. Williams, 9 Cir., 128 F. 362. Contra, see The Oceanica, 2 Cir., 170 F. 893, and Monk v. Cornell Steamboat Company, 2 Cir., 198 F. 472; but definitely settled by Compania de Navegacion, Interior, S. A., v. Fireman's Fund Ins. Co., 277 U.S. 66, 48 S. Ct. 459, 461, 72 L.Ed. 787, where the language of the Court in The Syracuse, supra, was adopted: "It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that, by special agreement, the canal-boat was being towed at her own risk, nevertheless, the steamer is liable, if, through the negligence of those in charge of her, the canal-boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences."

See, also, Mylroie v. British Columbia Mills Tug & Barge Co., 9 Cir., 268 F. 449.

Consequently the issue is narrowed to the determination of fault if any, by either the Loveland Company, the Russell Company, or the Russell tug.

That the weather conditions were such as to discountenance departure from Reedy Point on the morning in question is not borne out by the evidence. It so happens that snapshots were taken during the voyage and they wholly discredit the testimony of the bargeman of the Harris. He described the waves and the trough of the sea as exceedingly rough, with the waves approximately 7 or 8 feet in height, and with a wind velocity of 20 to 25 miles an hour. This testimony is contradicted by all of the Russell crew. But most important, the snap-

shots disclose a calm sea. It is significant that the bargeman of the Harris left the hatchway at the stern open from the time when the scow left Reedy Point until it was in trouble. That seems hardly consistent with his testimony concerning wind and sea.

Nor does the libellant establish fault in the makeup of the tow. On leaving Reedy Point the scow Harris was made fast on the tug's starboard side, and the float B-9 on the port side of the tug. The captain of the tug explained that the carfloat would not follow on two lines, and with the tide across the entrance to the Chesapeake & Delaware Canal at a ninety degree angle, had he proceeded on two lines in hawser formation he would have gone on the breakwater. So he continued with the tow down the Delaware River, with boats on either side as indicated, until he reached a position south of Ship John Lighthouse. This man was an experienced navigator in the Delaware River. Between Ship John Lighthouse and the reef known as Ben Davis Lake, which is marked by a gas buoy, following his custom he dropped his tow back making the float B-9 the hawser boat with the Harris astern thereof, with hawsers between seventy-five and a hundred fathom astern of the Russell to the car-float, and two 6 inch lines of fifty fathoms in length from the car-float to the Harris No. 2. The change in the position of the tow was made about noon. As they continued down the bay, the scow Harris No. 2 was observed to develop a slight port list. The captain determined that the man on the Harris was in some danger and so hauled the hawser to enable him to come alongside of the scow. Then the hawser was lengthened to a hundred fathoms of 6 inch line to one corner of the scow. At that time the scow had started to settle in the water. The captain replaced the cables on the B-9 and continued down the bay with the Harris still astern of the float B-9 and gradually settling. At that time the tide was ebb and in that tide Hufman tried to make Lewes, but had to ground the Harris in order to effect entrance between the two breakwaters at Lewes.

Thus fault cannot be attributed to the Russell for having left Reedy Point because of existing or impending weather conditions, nor because of the manner in which the tow was made up.

It must be observed that the libellant Harris has taken inconsistent positions with respect to the seaworthiness of the Harris No. 2. On the one hand the master of the scow said that her side planks were in perfect condition; that her fore and aft bulkheads were in good condition, and that she had been repaired as late as August, 1940, at a cost of $1,100. Schneir, who was the executive in charge of the vessel, directing its movements, testified that he had never had any complaint or difficulty with the Harris and that he had been aboard of her every day while she was on the construction job, and that she was "the best of our boats insofar as her condition and seaworthiness was concerned." On the other hand, the insurance inspector rejected the boat for insurance purposes. Unfortunately Mitchell was not called as a witness and in consequence he could not be examined as to why he was of opinion that she was "in no fit condition to be towed on her intended trip to New York".

In the light of the credible testimony in the case the conclusion is clear that the accident was not caused by negligent handling of the captain of the Russell, but because of the unseaworthiness of the Harris.

So the remaining question is whether the Russell was negligent in having taken the Harris, for the captain of the Russell before departure with the tow had been informed by the insurance inspector that the Harris was not in his judgment an insurable risk and had not been approved for the tow. But the contract for towage was not thereby revoked, for the insurance inspector had no authority from the libellant to revoke the order for the towage. At most the tug's captain was called upon to exercise special care in the light of that knowledge. Gormley v. Thompson-Lockhart, D.C., 234 F. 478; Dameron-White Co. v. Angola Transfer Co., 5 Cir., 19 F.2d 12; The Syracuse, D.C., 18 F. 828, and the weight of the testimony is that he was not wanting in that regard; leastways the libellant's burden of proof was not sustained.

There was opportunity for the libellant to notify Loveland or Russell before the tow left Reedy Point. Testimony concerning an alleged telephone message to some unidentified person in the Loveland office is not in the least persuasive. The mail by special delivery, telegram, to say nothing of telephone orders directly to Reedy Point were all media available to the libellant for cancelling or postponing the towage. They were not availed of.

In the circumstances the libel of the Harris Structural Steel Co., Inc., will be dismissed as against the Russell Bros. Towing

Company; and the Loveland Co., Inc., may have a decree for towage as claimed.

Concurrently with the filing of this opinion findings of fact and conclusions of law will also be filed.