### BRAMBLE et al. v. CULMER et al.

#### (Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

#### No. 186.

1. PILOTS—OWNERS AND CHARTERERS—RESPONSIBILITY FOR NEGLIGENCE, ETC.
   A pilot is so far the agent of the vessel that whoever is responsible for her navigation is responsible for his acts or omissions in the line of his duty; and unless there is some express contract, or some facts warranting implications or understandings contrary to uniform usage, the pilot must be considered the servant of the owner.

2. SHIPPING—CHARTERS—DEMISE OF VESSEL.
   When, by a charter, the shipowner undertakes to act as a carrier of goods, and appoints the master and crew, the responsibility for her safe navigation rests on him; but when the ship is completely transferred for a period of time, and the owner has nothing to do with the appointment of officers and crew, then the charterer becomes responsible for her navigation.

3. SAME—FURNISHING PILOT.
   When the charterers are to pay a lump sum to the owners, and defray port and pilotage charges, and the owners select and pay the master and crew, the mere fact that the charterers, at a port where no compulsory pilotage laws are in force, furnish a pilot, whose services are accepted by the master, does not make them responsible for the loss of the vessel through his incompetence or negligence.

Appeal from the District Court of the United States for the District of Maryland.

This was a libel in personam by Barzillia Bramble and Henry W. Elliott, owners of the schooner William Farren, and Calvin A. Murphy, her master, against James W. Culmer and Thomas B. Schall, to recover for the loss of said schooner, while under charter to the defendants. The district court dismissed the libel on the merits, and the libelants have appealed.

78 F.—32

Beverly W. Mister, for appellants.
Robert H. Smith, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge.    The primary and fundamental question in this case upon which the decision turns is whether, under the agreement between the parties, there was a demise of the ship, or whether it was a contract of affreightment.    If the owners parted with the whole possession and control of the ship, and gave to the charterers power and right to do what they pleased with regard to the captain and crew and the management of the ship, such charterers would become pro hac vice the owners, and would be responsible for its navigation and all the incidents flowing from that relation. If, on the other hand, the agreement between the parties was nothing more than a contract whereby the owners agreed for a fixed sum to send their ship for a cargo to be obtained at such points as the charterers might direct for transportation to its port of destination, and did nothing more to divest themselves of its ownership and control, then the responsibility for its proper navigation rests upon them, and they cannot hold the charterers to account.

The proper determination of the precise relations of the parties is not free from difficulty, owing to the informal nature of the agreement, there being no written charter party.    The contract was indefinite and verbal, and, so far as we can gather from the testimony, the facts were substantially these:    The owners of the William Farren, a small schooner, habitually employed in and about the Chesapeake Bay, some time in the spring of 1894, applied to one Schall, in Baltimore, for a charter.    Schall was engaged in the shipping of pineapples on joint account with one Culmer, who lived on Eleuthera Island, one of the Bahamas, and was in the habit of sending out a number of vessels every spring, and once before had chartered the Farren for that purpose.    Very little was said as to the terms of the charter, but it was understood that the owners were to receive the amount usually paid for schooners of like tonnage, and there is no dispute as to what that was.    The owners were told to get ready, and after employing as mate one Fehring, who was somewhat familiar with the West Indies, though he had never before been in the waters where occurred the incidents hereafter related, the master reported to Schall, and, receiving from him a letter to Culmer, set sail, arriving without accident or incident at Tarpum Bay, in Eleuthera Island, where he delivered to Culmer the letter intrusted to him.    It appears further from the testimony of Murphy, the master, that out of the gross sum to be paid by the charterers, the owners were to receive 40 per cent., and that the master was to receive 60 per cent., and "pay the expenses of the hands, wages, and grub bill."    It further appears, though there is no testimony showing any positive agreement on the point at the time that the charter was made, that it was understood that all pilot and port charges incurred in the Bahamas were to be paid by the charterers.    After reporting to Culmer, the master was informed that he was to get his cargo of pineap-

ples at Great Harbor, on Long Island, about 180 miles distant, and, taking aboard a pilot, set sail for that point, and while on the way, while off Conception Island, was run upon a reef, and the schooner became a total loss. It is for the loss of the vessel, caused, as alleged, by the incompetency of the pilot, that the libel is filed by the owners against Schall and Culmer, the charterers, the allegation being that the pilot was their agent; that "the reef was plainly indicated on charts for that part of the Atlantic Ocean"; and that loss of the vessel was solely due to the incompetency, unfitness, and ignorance of the pilot furnished by the charterers.

There are no licensed pilots at Tarpum Bay or in the waters thereabout, and no laws of compulsory pilotage, and the testimony relating to the taking of the pilot is brief. Murphy, the master, relates that, on the night after his arrival at Tarpum Bay, he was at Culmer's house, and, after some desultory conversation with him, he called out to a man he did not see in the dark, saying: "Peter, I want you to take the Farren to Great Harbor. You will sail Saturday morning." Culmer relates that Murphy asked "if I intended sending a pilot with him," and that he told him he would send Peter Allen, and it appears that he was to pay Peter Allen for this service. Peter Allen was a colored man, about 54 years of age, living on Eleuthera Island, who seems to have been engaged sometimes as a seaman in command of small vessels, sometimes as a pilot, and sometimes in cultivating pineapples on shares for Culmer and others. He was not a licensed pilot. He could read a little, but could not write. A great deal of testimony was offered to show his competency as a pilot, and it sufficiently established the fact that he had acted successfully as a pilot in conducting vessels safely through the waters where this untimely mishap befell. The testimony further shows that no great skill was needed at the point where the vessel went on the reef, and that any capable navigator could have sailed her safely there, special skill and local knowledge being required only at and about the entrance to the harbors. In the view we take of this case, it is not necessary that we should determine critically the competency of Peter Allen as a pilot. We are satisfied that he was believed to be competent; that he had frequently been employed in such undertakings, and that he was one of the most competent men available for such service in those islands; that Culmer had frequently intrusted him with the management of his own vessels; and that his previous success left him no room to doubt that he had the skill and knowledge required to pilot the vessel safely from Tarpum Bay to Great Harbor.

Nor is it necessary to consider in detail the circumstances attending the wrecking of the vessel. Whether it was solely due to the carelessness and ignorance of the pilot, which the preponderance of evidence tends to establish, or whether the master and mate contributed to bring it about by their refusal to keep the vessel on the course given to them by the pilot, as his unsupported testimony declares to have been the case, is not material to the determination of the main question, which is this: Was it the

duty of the owners or of the charterers to navigate the vessel? If it was the duty of the owners, the taking of the pilot was optional with them, and there being no law of compulsory pilotage in those waters, and the employment of the pilot being their voluntary act, and subsidiary and subservient to their use, they could not relieve themselves of responsibility by turning over the entire control of the vessel to him; and, by so much as he was ignorant and unacquainted with charts and the higher arts of navigation, to that degree did an increased duty of vigilance and care devolve upon the master and mate, who were in possession of charts, which, as their libel states, plainly indicated the reef upon which the vessel was wrecked. In any view of the case, the pilot would be considered as so far the agent of the vessel that whoever is responsible for its navigation would be responsible for his acts or omissions in the line of that duty; and, unless there is some express contract or some proof of facts which warrant implications or understandings at variance with uniform usage, the pilot must be held to be the servant of the owners.

It is the general and unvarying incident of all charter parties that the owners of vessels are charged with the duty of navigating them, and parties must, in reason, be understood to contract with reference to such obligation, unless it is excluded by special contract or necessary implication. It is not contended here that there was any express contract at the time the vessel was chartered in which the charterers undertook to navigate the vessel. The master, mate, and crew were selected by the owners, and paid by them. The charterers undertook to pay a lump sum for the voyage, which sum was divided between the owners and the crew in the proportion before stated. This was but an ordinary contract of affreightment, and, if the schooner had been lost on the way out to Tarpum Bay, there could have been no pretense that the charterers were liable. Did anything occur at Tarpum Bay to alter the original contract? If so, by whom was it done, and by whose authority? The owners were not there. It is not necessary to consider that class of cases where the master, away from the home port, has authority to make contracts binding the ship, as they have no relevancy. The reporting to Culmer at that place, and the sending of the vessel to Great Harbor for her cargo, was in accordance with the original agreement; and the taking of a pilot was incident and subservient to the purpose of the voyage, and did not change the relation of the parties; nor is the fact that the pilot was to be paid by the charterers inconsistent with the original agreement, for there was an understanding from the beginning that all pilotage and port charges were to be paid by them. The services of the pilot were for the benefit of the owners, to enable them to make the voyage by which they were to earn the charter money. They could have taken him or not, as they chose. In taking him, he became their servant. It is their misfortune that he proved incompetent. There was nothing in the act of taking the pilot which so far changed the relation of parties as to convert a contract of affreightment into a demise or letting of the ship. A short review

of the cases will make plain the distinction between these two classes of contracts.

When a shipowner agrees to carry goods by water, or to furnish a ship for the purpose of carrying goods in return for a sum of money to be paid to him, such contract is called a "contract of affreightment." The charterer thereby acquires the right to the temporary use of the vessel for the carriage of his goods, but the control and possession of the vessel remain in the owner, through the master and crew, who continue to be his servants. When a ship is let to another for a period of time, and the owner during that time has nothing whatever to do with the appointment of her officers and crew, or with the working or management of her, that is called a "demise" or "letting" of the ship. Scrutton, Charter Parties, pp. 1, 3; Carv. Carr. by Sea, p. 118 et seq.

Lord Esher, in Baumvoll v. Gilchrest (decided in 1891) [1892] 1 Q. B. 258, thus discusses the question:

"When is the captain the owner's captain? He is the owner's captain if the owner appoints him, and exercises authority over him, or has a right as between themselves to exercise that authority over him which an owner has ordinarily to exercise over his captain. * * * It seems to me, after listening to all the cases that have been cited, from the time of Lord Ellenborough downward, that through all the cases it has been assumed that the question depends, where other things are not in the way, upon this: Whether the owner has by charter, where there is a charter, parted with the whole possession and control of the ship, and to this extent, that he has given to the charterer a power and right independent of him, and without reference to him, to do what he pleases with regard to the captain, the crew, and the management and employment of the ship. That has been called a 'letting' or 'demise' of the ship. The right expression is that it is a parting with the whole possession and control of the ship, and in such case the captain is not the captain of the owner."

In this case, affirmed by the house of lords ([1893] 1 App. Cas. 8), the owners of the ship chartered her for four months to the charterers, who concurrently agreed to purchase her on certain terms at the expiration of the charter party. The charterers appointed and paid the wages of the captain and crew. The action was for damages for the loss of cotton upon bills of lading signed by the captain, caused by the alleged unseaworthiness of the ship. It was held that the captain was not the captain of the owners, and that they were therefore not responsible, having parted, under the terms of the charter party, with the possession and control of the vessel.

In Master of Trinity House v. Clark, 4 Maule & S. 288, when the vessel was chartered to the government for transport purposes at a certain rate per registered tonnage for each calendar month during the service, although the master and crew were paid by the owners, it was held by Lord Ellenborough that such possession by the owners was consistent with the entire ownership and possession of the vessel on the part of the crown, to enable it fully and beneficially to enjoy the same, the services of those best qualified to navigate it under the direction of the crown being hired together with the vessel itself. Stress was laid upon the object to be served, and upon the terms of the charter party, which were held to be proper words of lease. It was therefore decided that

the effect of the charter party was to transfer possession of the vessel to the crown during the term of service, and that the owners were not liable for certain light dues. This case, decided in 1815, has been so much distinguished and doubted since that it cannot be considered of much authority.

Meiklereid v. West, 1 Q. B. Div. 428, was held to be clearly a demise of the ship. In that case the ship was to be under the direction of the charterers to be employed within certain limits as ordered by them, for three or more calendar months, at their option; the charterers to pay for coals and all wages and expenses of the crew, and to deliver up the ship to the owners at the termination of the charter in as good order and condition as when delivered.

These are the leading English cases on the demise or hiring of ships.

In U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, the owners of the steamer Bowen agreed with the deputy quarter master general of the United States to furnish a vessel for a specified service in the harbor of New York, to provide an engineer and fireman, the remainder of the crew to be supplied by the United States, which also was to furnish fuel. The government was to pay $67 per diem for the use of the vessel, and the same was to be under its control and management. The Bowen, while so employed, was injured in a collision in New York harbor, and the claim was for reimbursement of expenses incurred. It was held that the contract was one of hiring, and not for service, and that the government, during its possession of the vessel, was a special owner. The court cites Reed v. U. S., 11 Wall. 591, where Justice Clifford uses this language:

"But where the general owner retains the possession, command, and navigation of the ship, and contracts for a specified voyage, as, per example, to carry a cargo from one port to another, the arrangement, in contemplation of law, is a mere affreightment, sounding in contract, and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership."

And in Leary v. U. S., 14 Wall. 607, Justice Field, speaking for the court, says:

"All the cases agree that the entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of such special ownership in the charterer."

The older cases of Hooe v. Groverman, 1 Cranch, 214, and Marcardier v. Insurance Co., 8 Cranch, 39, are to the same effect.

In Iron Co. v. Huntley, 2 C. P. Div. 464, a steamer was let to the sole use of the charterers, and for their benefit, for the space of six months, with option to take her longer. Freight for the hire of steamer was to be £410 per month. The charterers were to have the whole reach of the vessel, and were to pay for coals, port charges, pilotage, and extra labor, but the owner was to pay the crew, and find all ships' stores and other necessaries. In the course of

a voyage under this charter, the vessel was wrecked, owing to negligence of the master and crew; and the question was whether the owner was liable to the charterer for that negligence. It was held that he was, because, so far as concerned the navigation of the vessel, the owner had control for the purpose of carrying out his contract; that though the charterers might direct where the the vessel was to go, and with what she was to be laden, the owner remained in all respects accountable for the manner in which she might be navigated.

In Fenton v. Packet Co., 8 Adol. & E. 835, the steamer was chartered to one Dails for six months, at the rate of £20 per week, he to pay all disbursements, including pilotages, seamen's and captain's wages. For damages caused by a collision owing to the improper navigation of the vessel, it was held that the owners were responsible, they having the appointment and power of dismissal of the officers and crew, the possession and care of the vessel being thus left in their hands.

The result of all the cases seems to be this: Wherever the ship-owner undertakes to act as carrier of goods, and appoints the master and crew, the responsibility for her safe navigation rests upon him; but wherever the ship is completely transferred to the hirer for a period of time, and the shipowner has nothing whatever to do with the appointment of her officers and crew, then the charterer becomes responsible for her navigation. No case has been cited, and our researches have not disclosed any, where the mere appointment of a pilot has been held to operate so as to change legal ownership and responsibility. The pilot is considered as the servant or agent of the owner. The fact that he was selected and paid by the charterers cannot alter his relations to the ship.

Says the court in Bussy v. Donaldson, 4 Dall. 207:

"The mere right of choice, indeed, is one, but not the only, reason why the law in general makes the master liable for the acts of her servants; and, in many cases where the responsibility is allowed to exist, the servant may not, in fact, be the choice of the master."

Wherever the law of compulsory pilotage prevails, the master, in point of fact, does not choose his pilot; but that is never held in this country, at least, to absolve the vessel from responsibility for injury caused by the negligence of the pilot. It is different in England within certain districts, by reason of the statute of 17 & 18 Vict.

We do not find in Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique, 63 Fed. 847 (a case much cited by the appellant), anything not in consonance with the views upon which our decision rests. The injury complained of in that case being to a pier, a part of the land, and it not being a marine tort, the question involved was the liability at common law. The maritime law as to the responsibility of the vessel, and as to the position and powers of the master, is not derived from the common law. It is founded upon usages and practices so remote that their origin cannot be traced. This places the liability for all injuries done, not primarily upon the owner, but upon the vessel itself. All that

was actually decided in Ramsdell's Case was that the shipowner was not liable at common law for damages to a pier caused by the negligence of a pilot compulsorily employed. Ralli v. Troop, 157 U. S. 386, 15 Sup. Ct. 657.

Nor are we moved to a change in our views by the consideration of those cases cited by the appellants' counsel which hold that the navigation of the ship is under the exclusive control of the pilot. Whatever may be the rule in those jurisdictions wherein compulsory pilotage is in force, and where there is a body of intelligent, trained, and experienced pilots licensed by law, we are of the opinion that in this case, and with the pilot selected under the circumstances here disclosed, there was nothing to absolve the master from responsibility for the safe navigation of his vessel, and that he had the right and duty to displace him if any manifest incapacity was disclosed. The China, 7 Wall. 67; The Oregon, 158 U. S. 194, 15 Sup. Ct. 804.

This whole subject had thorough examination by Mr. Justice Grier in Smith v. The Creole, 2 Wall. Jr. 485, Fed. Cas. No. 13,033, who there states the law:

"The vessel, when under the control of a pilot, is in the legal possession of the owners. The pilot is their servant, acting in their employ, and receiving wages for services rendered to them. The fact that he was selected for them by persons more capable of judging of his qualifications cannot alter the relation which he bears to the owners. He is still their servant."

The decree of the district court is affirmed.