52 F.2d 795 (1931)
THE NIELS R. FINSEN.
CHILE S. S. CO., Inc.,
v.
RASMUSSEN et al.
THE CRESCENT.
THE R. J. BARRETT.
THE BARGE NO. 2.
UNITED MARINE CONTRACTING CORPORATION
v.
RASMUSSEN et al.
District Court, S. D. New York.
April 30, 1931.
*796 Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (S. R. Wright, of New York City, of counsel), for Chile S. S. Co., Inc.
Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for United Marine Contracting Corporation.
Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), for petitioner Christian Rasmussen.
Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for the R. J. Barrett.
Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for Bull Insular Line, Inc.
PATTERSON, District Judge.
On August 4, 1928, the steamship Chilcop, owned by Chile Steamship Company, Inc., lay docked along the north side of Pier 29, Brooklyn, bow inshore. Barge No. 2, owned by United Marine Contracting Corporation, *797 lay just behind the stern of the Chilcop, being also moored to Pier 29. There is disagreement whether the stern of the barge projected beyond the end of the pier. Some of the witnesses said that it did, the amount of the projection being estimated at from two to ten feet. Others testified that the offshore end of the barge was within the end of the pier by a comfortable margin.
The steamship Finsen, owned and managed in Copenhagen and under time charter to Bull Insular Line, Inc., was proceeding up the harbor to a berth on the south side of Pier 27. There is no Pier 28, and the slip which the Finsen was to enter was the same in which the Chilcop and the barge were moored. When a short distance away, she was met by two tugs sent to assist in docking her. The captain of one of the tugs, one Mattisen, boarded the Finsen and said that he would handle the operation. The master of the Finsen, one Rasmussen, stood beside him on the bridge. The task was rendered a delicate one by the presence of vessels tied up at the offshore end of Pier 27 on the south side, the berth for the Finsen being near the shore end. One tug took position at the Finsen's bow, the other at her stern to help swing her around, while the Finsen under her own steam approached the slip. Mattisen was at the wheel. In the maneuver the Finsen struck Barge No. 2. The blow was described by the witnesses as a slap from the port side of the Finsen's bow, but the impact was sufficient to crash the barge into the stern of the Chilcop, doing serious damage to the latter's propellor. The barge itself was also badly damaged.
As already observed, the Finsen was under time charter to Bull Insular Line, Inc. The charter was in the standard government form, the owners to provide the personnel for navigating the steamer and to be responsible for its operation, the charterer to furnish and pay for pilotage and port charges. The charter specifically declared that it was not to be deemed a demise of the ship. Pursuant to its right and duty under the charter, the charterer had made arrangements with a towing company, Conrad Mathiasen & Company, Inc., to do the towing necessary to dock the Finsen, and it was this company that supplied the two tugs. Mattisen, the man who was piloting the Finsen when the trouble occurred, was captain of one of these tugs and was an employee of the towing company. It appeared that the towing company had regularly done all towing in New York Harbor for the charterer, Bull Insular Line, Inc., and that the so-called "pilotage clause" formed a part of the agreement between them. The agreement itself was apparently oral and was for each piece of work. The "pilotage clause" appeared on the bills rendered by the towing company after the work was done. The evidence is that many such bills had been rendered before the work in question was performed and that it was agreed by both parties that the towing company undertook the work on the understanding that the "pilotage clause" governed. It was also shown that a similar clause was used by many other towing companies doing business at this port. The "pilotage clause" reads as follows: "When the captain of any tug furnished to or engaged in the service of assisting a vessel is (sic) making use of her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed that said tugboat captain or licensed pilot becomes the servant of the owners of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents or charterers shall be liable for any damage resulting therefrom."
Separate libels against the Finsen were filed by the owner of the Chilcop and the owner of the barge. The master of the Finsen by petition brought in the charterer, the towing company and the tugs. The towing company is apparently insolvent and did not defend at the trial.
1. In my opinion, no fault attaches to the barge. Upon the conflicting evidence, I find that the stern of the barge did not project beyond the end of the pier. There seems to have been ample room on the side of the pier for both the Chilcop and the barge, and there was thus no reason for leaving the barge in the position which the respondents claim it occupied. Even if there was a projection, it was trifling, not more than two or three feet, and there was no obstruction to navigation. The position of the barge did not contribute to the collision. Cases like The Herm (C. C. A.) 267 F. 373, and The Frank (C. C. A.) 40 F.(2d) 430, where the overhang was substantial, are not in point.
2. It is equally clear that no responsibility for the accident can be placed upon the tugs. They merely obeyed orders from the bridge of the Finsen, and there was *798 nothing manifestly improper in the orders received and executed. As I understand it, no one contends that the tugs are liable.
3. The evidence shows that the collision was attributable solely to careless navigation of the Finsen. In a collision between a moored vessel and a moving one, the presumption is that the latter was at fault. Here the evidence supports the presumption. It seems reasonably certain that the tug captain who had assumed the task of docking the Finsen was not familiar with her operation and miscalculated the time it would take for her to respond to her wheel and to changes of speed, and that such miscalculation was the cause of the collision. It has been suggested that there was trouble with the Finsen's engines or other equipment, but there is no substantial proof in support of it and I do not credit it. It being plain that the damages were caused by faulty operation of the Finsen by the pilot in charge, the Finsen is liable in rem for the damages inflicted upon the Chilcop and the barge.
4. The remaining question is whether either the towing company or the charterer is liable over to the owners of the Finsen. Apart from the "pilotage clause" in the towing contract, there can be little doubt that the towing company is under such liability and that the charterer is not. As to the towing company: It undertook as independent contractor the work of docking the steamer. Its employee, the tug captain, took charge of the operation as part of the job which he held and for which he was paid by the towing company. Except for special situations presented by the limitation of liability acts and the like, the rule of respondeat superior applies in maritime cases as fully as in nonmaritime cases, and the operation of this rule would place liability in personam upon the towing company for the damages caused by the negligence of its employee. The Edward G. Murray (C. C. A.) 278 F. 895. See also The W. S. Holbrook (D. C.) 294 F. 908, affirmed in (C. C. A.) 294 F. 911. The fact that the Finsen is held liable in rem for damages suffered by strangers is not inconsistent. Such liability does not rest upon grounds of agency and does not alter the fact that as between the Finsen and the towing company, the latter is ultimately chargeable. As for the charterer: The charter was not a demise of the Finsen. Under a charter of this type, the proper navigation of the steamer is the concern of the owner, not of the charterer. This is true even where the charterer is to provide and pay for pilotage and where the damage is due to unskillful work on the part of a pilot furnished by the charterer. The fact remains that the docking of the vessel was part of her navigation, and the charterer is not liable because of the negligence of the pilot. The Volund (C. C. A.) 181 F. 643; Luckenbach v. Insular Line (C. C. A.) 186 F. 327. Many other cases to the same effect might be cited.
Does the "pilotage clause" change these legal consequences? The purpose of it is of course to shield the towing company from liability for the acts of its representative when the latter boards a vessel, but only, it may be observed, in cases where the vessel is making use of its own propelling power. The validity of such an agreement, in this circuit at least, is not open to doubt. A much broader provision exempting towing companies was sustained in The Oceanica (C. C. A.) 170 F. 893; and in several recent cases the validity of a pilotage clause phrased exactly as in the present case has been upheld. The Dalzellite (The Sabine Sun), 48 F.(2d) 598, 1931 A. M. C. 56 (D. C.). See also Naamlooze v. Moran Towing & Transportation Co. (C. C. A.) 9 F.(2d) 614. But in this case the owners of the ship were not parties to the towing contract. That contract was made between the towing company and the charterer. The latter was not agent for the owners, and so far as appears neither the owners, managing agents, nor master were cognizant that the contract for towage contained an exemptive provision in favor of the towing company. It seems to me that the pilotage clause did not bind the owners of the Finsen, any more than the charterer's promise to pay for towage bound them or the vessel. See The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512; Curacao Trading Co. v. Bjorge (C. C. A.) 263 F. 693. Consequently their rights against the towing company, whose servant caused the damage, are not impaired by the presence of that clause in the agreement between the towing company and the charterer.
It is argued in behalf of the owners that the charterer subjected itself to liability by making a contract for towage with a pilotage clause as part of the contract. The anxiety of the owners to hold the charterer responsible is due to the insolvency of the towing company. It is said that the charterer should be held because it destroyed the right of recourse which the owners would otherwise have had against the towing company. The argument is not convincing. If *799 the towing company is liable to the owners of the Finsen despite the pilotage clause, as I have just held in the preceding paragraph, then obviously there is no merit in the position taken by the owners against the charterer. So far as the owners are concerned, the pilotage clause had no existence. If, on the other hand, the pilotage clause were to be held binding on the owners, this could be only on the assumption that the clause was such a customary one or even such a universal one in towing work in New York Harbor that the owners, by stipulating that the charterer should provide pilotage, consented to have their ordinary rights abridged by the pilotage clause. But on such assumption the charterer worked no wrong upon the owners. On either hypothesis, therefore, as to the effect of the pilotage clause upon the owners' rights against the towing company, the charterer did not become liable to the owners.
It follows that the libelants, the owner of the Chilcop and the owner of the barge, are entitled to a decree in rem against the Finsen for their damages in full, and that the owners of the Finsen are entitled to a decree in personam against the towing company. There is no liability on the part of the charterer or the tugs.