## THE WEST ELDARA.

**AMERICAN DIAMOND LINES, Inc., v. McALLISTER TOWING & TRANSPORTATION CO., Inc., et al.**

**No. 104.**

Circuit Court of Appeals, Second Circuit.
Jan. 9, 1939.

Purdy, Mason & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for appellant McAllister Towing & Transportation Co.

Frank V. Barns, of New York City, for appellant Seal Shipping Co.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for appellee American Diamond Lines, Inc.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The S. S. West Eldara, under a time charter to the Seas Shipping Company, Inc., for one round trip from the United States north-Atlantic ports to South and East Africa, intended to load cargo at Pier 6, New York Docks, Brooklyn. On the morning of June 22, 1936, she passed through Buttermilk Channel in the East River in the vicinity of Pier 6 and when between Governors and Manhattan Islands, she was met by two tugs of the appellant McAllister Company, which had been engaged by telephone by an officer of the charterer Seas Shipping Company, Inc., to assist in docking the vessel at Pier 6. There was no written contract for this assistance, but the charterer was in possession of the towage schedule, containing the pilotage clause discussed hereafter. As the vessel was being maneuvered toward her dock, her stem came in collision with the bulkhead of Pier 5, causing damage to the bow of the West Eldara. One tug, the Federal No. 1, only was assisting in the docking.

Captain Cregan of the McAllister Company went aboard, taking command of the navigation of the West Eldara, and the Sandy Hook pilot, who had navigated her up the bay, stood aside. Capt. Cregan ordered the engines slow ahead, then full astern, and cast off the starboard anchor, but the West Eldara collided as stated. The tug Keogh did not have a line aboard the West Eldara until after the collision and the trial judge found that she stood by on the north side of Pier 5 and did not actually engage in the docking up to the time of collision. He found that the failure to utilize this tug was an act of negligence; that the collision was due to negligent navigation. We are in accord with this finding.

The court found that there was evidence that appellee knew of a custom of incorporating the pilotage clause in docking agreements and had made agreements for the towage of its vessels accordingly. But having found this, the court concluded that appellee had no part in making the towage contract; that it did not appear from the evidence that the owner knew that the vessel was being docked under such an agreement, which made the captain of the tug boat, engaged in the service of assisting the West Eldara, the servant of the owner. For this reason the court held that the Seas Shipping Company, Inc., in employing the tugs had no authority to bind the owners to the terms of the customary towage contract. The charterer was held liable over to the McAllister Company.

The captain of one of the tugs may and usually does go aboard the ship as pilot. The pilotage clause of the towage contract reads, "when the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed, that said tugboat captain or licensed pilot becomes the servant of the owners of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service, and in respect to the handling of such vessel and neither those furnishing the tug and/or pilot or the tugs, their owners, agents or charterers shall be liable for any damage resulting therefrom."

The time charter under which the appellant, Seas Shipping Company, Inc., engaged the ship did not amount to a demise of the vessel. Clyde Commercial S. S. Co. v. West Indies S. S. Co., 2 Cir., 169 F. 275; Dunlop S. S. Co. v. Tweedie Trading Co., 2 Cir., 178 F. 673. By Clause 2 of the charter, it was agreed "that the Charterers shall provide and pay for, * * Pilotages, * * * and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which the vessel is responsible, then all such charges incurred shall be paid by the owners * * *."

The question presented by this appeal is whether the owner is, under the circumstances, responsible for the negligent acts of Capt. Cregan. In Munson S. S. Line v. Glasgow Navigation Co., 2 Cir., 235 F. 64, a charterer was held not debarred of the right to maintain a suit against the owner to recover over after payment of a judgment recovered against it for injury to a stevedore. There was no demise of the vessel; the owner was required to provide and pay for all provisions, wages and steam winches; the charterer was required to pay the expenses of loading and discharging; the stevedore was injured due to the negligence in the use of a winch. While the charterer was obliged by contract to pay the expense of loading and discharging, the legal duty of loading and discharging still rested upon the owner, and as between the charterer and the owner, the latter was held responsible for injury to a stevedore resulting from negligence of a winchman while discharging. There we said [page 68]:

"It is quite plain from the foregoing provisions that the charterer is to pay the expense of the loading and unloading except for the winches and winchmen, who are to be provided by the owner, though any extra payment for night work is to be defrayed by the charterer. This obligation to pay for the unloading does not make the unloading the duty of the charterer, but leaves the legal duty of loading and discharging upon the owner, just as the duty of navigation remained upon the owner, although it was being performed by a supercargo appointed and paid by the charterer. The Volund, [2 Cir.] 181 F. 643."

Under the time charter, the crew of the vessel, including her master, were likewise the servants of the owners and when Capt. Cregan went on board he was, for the time being, in charge of the vessel, and "since the navigation remains in the hands of the owner, all instrumentalities (human or other) which he uses to conduct it are his own while thus employed, no matter from whom he obtains them." The Volund, 2 Cir., 181 F. 643, 666. There this court refused to find that the clause of the charter party providing that the charterer should provide and pay for pilotages did in any way relieve the owner of its duty to navigate the vessel, and we further said that the master need not have allowed the pilot to conduct the navigation unless he was satisfied to trust it to him, and if dissatisfied he could have removed him.

In a time charter such as this, the navigation of the vessel has been repeatedly held to be the entire responsibility of the ship owner. The Terne; Bergen Lloyd A/S v. Munson S. S. Line, 2 Cir., 64 F.2d 502; Luckenbach v. Insular Line, 2 Cir., 186 F. 327. The fact that the charter provided that the charterer should provide and pay for pilotage and port charges did not make the pilot the agent of the charterer. His negligent acts as found were acts of navigation. The owners were responsible for the entire navigation of the ship. The Leader, D.C., 166 F. 139; Dunlop S. S. Co. v. Tweedie Trading Co., 2 Cir., 178 F. 673; Bramble v. Culmer, 4 Cir., 78 F. 497.

The contract made by the charterer with the towing company was to furnish tugs to assist the docking of the vessel. The work of such assistance is considerably less of an undertaking than where the vessel is without steam and a crew. The master, officers and crew of this vessel were obliged to be at their stations and the power of the vessel was used. But appellee contends that the charterer could not act as agent without authorization, and bind it to a towing contract including the clause referred to, which releases the towing company from liability for negligent acts of its servants when the pilot boards the vessel and directs its navigation. This is true. Appellee, however, was always in control of the navigation of the vessel, a responsibility of which it had not divested itself by the terms of the charter party. If appellee desired to do so, it might have employed the towing company as an independent contractor and thus have divested itself of all responsibility for the vessel's navigation while docking. But since appellee always retained the control, Capt.

Cregan's acts are chargeable to the owner. The Volund, supra; The Terne; Bergen Lloyd A/S v. Munson S. S. Co., supra; Luckenbach v. Insular Line, supra; The Leader, D.C., 166 F. 139.

Conceding that the charterer had no authority to bind the owner by its engagement with the towing company, still, the owner's representative on the ship, the master, acquiesced in and consented to Capt. Cregan's coming on board and directing the vessel's navigation while docking. The vessel's master might have forbidden Capt. Cregan's thus giving directions. But on the contrary, the master and crew of the vessel accepted and acted upon Capt. Cregan's orders. Under these circumstances, if Cregan's negligence resulted in damage to third parties, appellee would be responsible. The Volund, supra. Damage to the vessel by reason of Cregan's negligent acts must likewise be visited upon the owner. Retention of control over the navigation of the vessel made Cregan's acts its own. The Leader, supra; Worrall v. Davis Coal & Coke Co., 2 Cir., 122 F. 436; Bramble v. Culmer, 4 Cir., 78 F. 497.

In Bramble v. Culmer, supra, the ship was under a time charter, by virtue of which the charterers were to select and pay for all pilots. The charterers employed a competent pilot to take the ship from one island in the West Indies to another, past a dangerous reef. Through the negligence of the pilot, the ship grounded on the reef, and was totally lost. In a suit by the owners against the charterers, recovery was denied and the libel dismissed. The court undertook an extensive review of the American and English cases on the subject, showing that under a demise charter the control of the vessel is in the charterer, and hence that the pilots are servants of the charterer and not of the owners; but in time charters, the reverse is the case, and pilots are the servants of the owners. It was said [page 500], "the pilot would be considered as so far the agent of the vessel that whoever is responsible for its navigation would be responsible for his acts or omissions in the line of that duty; and * * * the pilot must be held to be the servant of the owners. It is the general and unvarying incident of all charter parties that the owners of vessels are charged with the duty of navigating them, and parties must, in reason, be understood to contract with

reference to such obligation, unless it is excluded by special contract or necessary implication." The court concluded: "The result of all the cases seems to be this: Wherever the shipowner undertakes to act as carrier of goods, and appoints the master and crew, the responsibility for her safe navigation rests upon him; but wherever the ship is completely transferred to the hirer for a period of time, and the shipowner has nothing whatever to do with the appointment of her officers and crew, then the charterer becomes responsible for her navigation. No case has been cited, and our researches have not disclosed any, where the mere appointment of a pilot has been held to operate so as to change legal ownership and responsibility. The pilot is considered as the servant or agent of the owner. The fact that he was selected and paid by the charterers cannot alter his relations to the ship."

The libel should have been dismissed and a decree entered for appellants.

Decree reversed.