UNITED STATES of America, Plaintiff,

v.

GTS ADM. WM. CALLAGHAN, her engines, tackles and appurtenances, etc., Defendant.

and

GTS ADM. WM. CALLAGHAN, her engines, tackles and appurtenances, etc. and Sun Export Holdings, Inc., Third-Party Plaintiffs,

v.

McALLISTER BROS., INC., Third-Party Defendant.

No. 83 Civ. 7957 (RWS).

United States District Court, S.D. New York.

June 10, 1986.

---

See also, D.C., 643 F.Supp. 1483.

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Richard K. Willard, Asst. Atty. Gen., Janis G. Schulmeisters, Atty. in Charge Torts Branch, Civil Div. U.S. Dept. of Justice, New York City, for U.S.; Lawrence B. Brennan, of counsel.

Walker & Corsa, New York City, for third-party plaintiff; Christopher H. Mansuy, of counsel.

Healy & Baillie, New York City, for third-party defendant; William F. Losquadro, Wegard D. Holby, of counsel.

SWEET, District Judge.

The GTS ADMIRAL WILLIAM CALLAGHAN (the "CALLAGHAN"), her owner and underwriter seek damages by way of a third-party claim against the third party defendant McAllister Bros., Inc. ("McAllister") arising out of an allision on May 13, 1979 when the CALLAGHAN struck the east bulkhead of the Military Ocean Terminal (the "Terminal"). On the findings and conclusions set forth below, the third-party claim will be denied, and judgment will be entered dismissing the third party complaint with costs and disbursements.

## Prior Proceedings

The complaint of the United States against the CALLAGHAN was filed on November 1, 1983, asserting damages to the Terminal in the amount of $359,000 resulting from the allision. This claim was settled on December 13, 1985 for $50,000 to be paid on behalf of the CALLAGHAN by her owner and underwriter, a settlement which was approved by the United States on March 21, 1986.

The third party complaint by the CALLAGHAN against McAllister, which had provided docking and piloting services, was filed on February 2, 1984. Discovery was had and a bench trial was held on March 31 and April 1, 1986, with final submissions made on April 28, 1986.

## Facts

The United States owns the Terminal, a shoreside installation in Bayonne, New Jersey, in the Port of New York.

CALLAGHAN, an ocean-going vessel, was built in the mid 1960's by Sun Shipbuilding and Dry Dock Company ("Sun") pursuant to a construction contract with Sunexport Holdings Corporation ("Sunexport Holdings"). She is 550' in length, powered by gas turbines, producing 63,000 horsepower per shaft, greater than that of a World War II heavy cruiser. She was bareboat chartered by Sunexport Holdings to Sunexport, a joint venture, which in turn time chartered the ship to the United States pursuant to a charter party dated October 29, 1965. The time charter states that the CALLAGHAN was built specifically for the performance of the October 29, 1965 charter party and provides that Mili-

tary Sea Transportation Service ("MSTS") pay for all tug and pilotage services and that the charterer shall indemnify MSTS for any claims. The CALLAGHAN has been trading regularly with the Port of New York since her construction and has been in and out of the Port since 1979.

McAllister, a New York corporation having an office and principal place of business in the City and State of New York, is engaged in the business of towage and transportation.

On May 13, 1979, in reduced visibility due to fog, McAllister's tug, ERIC McALLISTER, (the "ERIC") with Captain Leslie W. Harris ("Harris") aboard, was awaiting the arrival of the CALLAGHAN in the upper bay of New York harbor in the vicinity of the Nos. 22 and 24 buoys, located on the Brooklyn side of the main ship channel across from the Staten Island ferry slips. Also waiting was McAllister's tug MARK McALLISTER (the "MARK"). Harris testified that it was customary for tugs to wait for vessels bound for the Government's Military Ocean Terminal in the vicinity of the Nos. 22 and 24 buoys. Harris was employed by McAllister as a tug captain and also was a docking pilot duly licensed by the United States Coast Guard.

ERIC received a VHF radio call from CALLAGHAN informing the tug that the ship was off the Military Ocean Terminal, past the location where the tug had been waiting. Both tugs then got underway and came up to the CALLAGHAN, which had already turned out of the main ship channel and into the approach channel to the Terminal, in the area bound by the Nos. 1, 2, 3 and 4 buoys. Harris boarded the CALLAGHAN from the ERIC and proceeded to the bridge. The tide was flooding at the time, and visibility was reduced due to fog. The MARK proceeded to CALLAGHAN's port bow and placed a head line up on the vessel and the ERIC lay off the vessel awaiting orders, as was requested by Harris before he boarded the vessel.

When Harris entered through the starboard door of the navigation bridge of the CALLAGHAN, which was at the after end of the ship, he was met at the door by the harbor pilot, Lyn Vanderwater, who informed Harris that the vessel was dead in the water and asked Harris to be relieved. The CALLAGHAN's watch officer logged Harris' arrival on the bridge at 0708. On the bridge with Vanderwater when Harris arrived was the quartermaster located at the helm and the watch officer located at the engine order telegraph. The master was outside on the port wing of the bridge. Harris responded to Vanderwater to "wait a minute" until he could check things out, and he walked to the port wing where he greeted the master. Before Harris relieved Vanderwater, Vanderwater apparently ordered the port engine half astern and full astern at 0710, with the starboard engine stopped until 0711 when the port engine was stopped. Harris was not given this information by Vanderwater.

From the port wing, Harris observed the No. 3 buoy off the vessel's port beam and Robbin's Reef Light and looking forward saw the outline of the shore. Harris then proceeded from the port wing to the radar located on the starboard side of the bridge where Vanderwater was located and observed on radar the land mass ahead with the vessel generally head on to it. He asked Vanderwater if he would remain on the radar. Harris then relieved him of the conn and returned to the port wing to rejoin the master where they remained side by side. At this time, the fog closed in, apparently rolling in from the port side, and visibility reduced to no more than a ship length. Harris was able to see the outline of the bow of the CALLAGHAN and MARK on the vessel's port bow, but nothing else.

The CALLAGHAN's chief mate, John Dorozynski, was at the bow and was in radio contact with the master. Dorozynski was asked by the master to report any sightings. The MARK was in handheld radio contact with Harris on a different frequency. Meanwhile the MARK, positioned on the vessel's port bow, was ordered to come half-ahead on her engines, to bring the CALLAGHAN's bow to star-

board to enter the north channel at the Terminal. The MARK was observed complying with this command.

Harris fixed the CALLAGHAN's position only visually, did not request or obtain any radar ranges or bearing, did not note the ship's heading, and neither observed or directed a plot of the ship's position and course speed. Harris' first engine command was dead slow ahead, logged in the deck bell book at 0712 hours. Under the CALLAGHAN's acceleration tables she would travel 600′ at this speed in three minutes and require two minutes at full astern to stop. About two and one-half minutes later, the engines were stopped. The chief officer on the bow still was not able to see land due to the severely restricted visibility nor did the MARK. Approximately one-half minute later, the chief officer reported sighting land ahead and told the bridge to go full astern. Harris immediately ordered full astern, logged by the watch officer at 0715, one-half minute after having stopped both engines. The engine room executed first a slow astern, then half astern, and finally full astern which was logged at 0714 in the engine bell book. There apparently is approximately a one minute difference between the bridge bell book and the engine bell book, the latter being earlier. CALLAGHAN's headway was not broken, and at 0715 she contacted the east bulkhead causing damage.

The master, who was not called to testify at trial, expressed no disagreement whatever with any action or command given by Harris, either over the radio to the tug or by voice to those in the bridge. There were no warnings or cautions given by Vanderwater who was stationed on the radar or by anyone else in the bridge to the master or to Harris prior to the allison. The cost of repair of the bulkhead was $340,075.

The services of McAllister were provided under a contract with MSTS (the "government contract") which contained the following clause:

When the captain or other officer of any tug furnished for or engaged in the service of furnishing tug power or assistance to a vessel which makes use of or has readily available her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed that said tug captain or other officer or licensed pilot becomes the servant of the owners of said vessel in respect to the giving of orders to any of the tugs provided for or engaged in said services and in respect to the handling of the vessel and neither those providing the tug or pilot, nor the tugs, their owners, charterers, operators, managers or agents shall be under any liability for executing the orders of said tug captain or other officer or licensed pilot or be liable for any damage resulting therefrom, unless the damage is caused by or results from the negligence or wrongful act or omission of the tug owners, charterers, operators, managers, employees or agents of those furnishing the tug or pilot.

After the allision, the master of the CALLAGHAN executed McAllister's standard receipt for tug services ("Tug Receipt") which states as follows:

We do not furnish pilots or pilotage to vessels making use of or having available their own propelling power so that whenever any licensed pilot, or a captain of any tug which is furnished to or is engaged in the service of assisting a vessel making use of or having available her own propelling power, participates in directing the navigation of such vessel, or in directing the assisting tugs, from on board such vessel or from elsewhere, it is agreed that he becomes the borrowed servant of the vessel assisted and her owner or operator for all purposes and in every respect, his services while so engaged being the work of the vessel assisted, her owner and operator, and being subject to the exclusive supervision and control of the vessel's personnel. Any such service performed by any such person is beyond the scope of his employment for us and neither those furnishing the tugs or lending any such person, nor

the tugs, their owners, agents, charterers, operators or managers shall be liable for any act or omission of any such person. The provisions of this paragraph may not be changed or modified in any manner whatsoever except by written instrument signed by an officer of this company.

With respect to vessels that are not owned by the person or company ordering the tug service, it is understood and agreed that such person or company warrants that it has authority to bind the vessel owner to all the provisions of the preceding paragraphs, and agrees to indemnify and hold us harmless, and also those furnishing the tugs and the tugs, their owners, agents, charterers, operators and managers, from all damages and expenses that may be sustained or incurred in the event and in consequence of such person or company not having such authority.

The master executed the Tug Receipt without reservation or notation.

Thereafter, as was customary, McAllister forwarded its invoice No. 015–27 dated May 14, 1979 to "ADM. W. CALLAGHAN, MSCLANT [Military Sealift Command], MILITARY OCEAN TERMINAL." The invoice contained the identical Pilotage Clause contained in the Receipt for Tug Services signed by the master the prior day. McAllister thereafter submitted an invoice for $7,200 to MSTS for the work performed.

McAllister's practice, as described above, was consistent with its port practice and was known to and accepted by the owner of the CALLAGHAN and MSTS. Previous invoices rendered to the owner of the CALLAGHAN by McAllister contained the pilotage clause, and the officers of the CALLAGHAN were aware of the tug contracts with the government and the tug receipts previously signed.

**Conclusions**

Harris, McAllister's employee, was negligent in failing to obtain a fix of the CALLAGHAN's position by radar range and bearing when he took the conn and failing to obtain the range and bearing of the bulkhead thereafter. He relied on a seaman's eye, the sight of navigational aids, and a feel for his circumstances, bred of familiarity, none of which manifestly proved to be adequate in a dense fog. No matter how cautious the approach, the Braille method of docking can have unfortunate results for a vessel, like the CALLAGHAN, 550' long and powered with gas turbines. However, Harris' negligence is shared with the master who presumably was more familiar with the CALLAGHAN's characteristics and also failed to obtain or observe any radar ranges and bearings even after Harris took the conn. Both officers are equally culpable. Finally, it has not been demonstrated that McAllister was negligent in providing Harris as a pilot or that any of its tugs or employees other than Harris contributed to the accident.

The resulting liability for negligence of Harris and the master of the CALLAGHAN depends on the pilotage clauses included in the contract for tug services between the government and McAllister and in the receipt provided by McAllister in connection with the services rendered. The CALLAGHAN contends that the receipt which it signed was not binding on it and that the pilotage clause in the government contract does not bar imposition of liability on McAllister due to the negligence of its pilot.

The pilotage charge in the government contract differs from that found in McAllister's tug receipt in that it includes the following addendum which holds McAllister liable where: "the damage is caused by or results from the negligence or wrongful act or omission of the tug owners, charterers, operators, managers, employes or agents of those furnishing the tug or pilot." Although the CALLAGHAN asserts that this clause strips McAllister of its pilotage immunity, this broad reading is not in accordance with a proper construction of the government contract.

■ When all of the elements of the pilotage clause on the government contract are read in conjunction, McAllister is liable only for the negligence of its employees or agents other than the pilot himself. The first half of the pilotage clause contains the familiar exculpatory language which refers specifically to the tug captain, officer or pilot who boards a vessel which has available its own power. That subclause states that, in such circumstances, the pilot becomes the servant of the owners of the vessel and that McAllister will not be liable for the pilot's handling of the vessel or for the orders given by the tug pilot. The addendum then states that, notwithstanding its exoneration of the actions of the pilot, McAllister will be liable should any damage be caused by the negligence of "the tug owners, charterers, operators, managers, employees or agents of those furnishing the tug or pilot."

Although the tug pilot is certainly an employee of McAllister, it would be inappropriate to include the pilot within the scope of this addendum since such an interpretation would render the first subclause meaningless. Since the first half of the subclause refers specifically to the pilot, that specific language should control over the general reference to employees in the second half of the pilotage clause. Therefore, it appears that the addendum included in the second half of the pilotage clause refers to all persons under the control of McAllister except the pilot. If damage is caused by the negligence of any of these other persons, then McAllister will be held liable. Thus, the addendum indicates that the pilotage clause does not extend beyond the actions of the pilot. It does not, however, strip McAllister of its pilotage immunity.

Having determined the appropriate interpretation of the pilotage clause in the government contract, its application to the factual findings of this case becomes a straightforward matter. As indicated, the damages caused to the terminal resulted from the negligent handling of the vessel by both the tug pilot and the master of the vessel. Under the pilotage clause, the pilot's conduct at the conn must be attributed to the owners of the vessel by virtue of the pilotage clause. While the tug pilot was negligent, no other employee or person under the control of McAllister has been found to be negligent. Therefore, there is no basis for applying the inculpatory language in the pilotage clause.

■ The only other issue remaining is whether the owners of the CALLAGHAN can be bound by the government contract which was executed by the charter party MSTS and the tug company, McAllister. Although two cases have been cited in opposition to the imposition of contractual liability on the owner of a vessel, each is distinguishable.

In *The West Eldara*, 101 F.2d 45 (2d Cir.), *modified on rehearing*, 104 F.2d 670 (2d Cir.1939), a vessel under a time charter collided with a dock while being piloted by a local tug pilot. The pilot was provided following a telephone call from the charterer. While there was no written agreement between the charterer and the tug company, the charterer had consulted a towage schedule containing the exculpatory pilotage clause. The Court of Appeals affirmed the district court's ruling that the charterer had no authority to bind the owner to the pilotage clause because it did not appear from the evidence that the owner knew that the vessel was being docked under such an agreement. 101 F.2d at 46.

Similarly, in *The Niels R. Finsen*, 52 F.2d 795, 799 (S.D.N.Y.1931), the court refused to bind the owner of a vessel to an oral towage agreement arranged by the charterer. The court, however, limited its holding by noting that:

So far as the owners are concerned, the pilotage clause had no existence. If, on the other hand, the pilotage clause were to be held binding on the owners, this could be only on the assumption that the clause was such a customary one or even such a universal one in towing work in New York Harbor that the owners, by stipulating that the charterer should provide pilotage, consented to have their

ordinary rights abridged by the pilotage clause.

52 F.2d at 799.

It is common knowledge in the shipping industry that the pilotage clause is now included in all tug service contracts in the Port of New York. In fact, this court has found that the pilotage clause has been in universal use in New York harbor for nearly fifty years, and is a custom in the industry in New York. In *Lyons Creek-Sister Katingo,* 1967 A.M.C. 1561 (S.D.N.Y.1967), the court stated:

> The Pilotage Clause, in terms similar to Moran's, has been in universal use in New York harbor for nearly 50 years. All tug companies in New York Harbor furnishing tug assistance for docking and undocking vessels have used the clause and in 1960 the three major tug companies Moran, McAllister and Dalzell had such a clause as one of their terms and conditions. The Pilotage Clause was, in fact, in 1960 and for many prior years had been, a custom in the industry in New York Harbor.

1967 A.M.C. at 1573. This judicial observation is also supported by the evidence adduced at trial.

The signing of receipts, particularly on more than one occasion, has been construed by the courts to give the owner notice of the pilotage clause. In *Federal Steam Nav. Co. v. Tugs SAVANNAH & R.W. GROVES,* 305 F.Supp. 1293 (S.D.Ga.1969), the court found notice based on two prior tug receipts signed by the captain which included the pilotage clause, plus the fact that other masters of the plaintiff's line had received copies of the towage conditions twenty times in the preceding two years. In *Consolidated Rail Corp. v. LAGADA BEACH,* 1983 A.M.C. 1242 (E.D.Pa. 1982), *supra,* it was held that the master was deemed on notice of the pilotage clause by signing four receipt slips which included the pilotage clause.

A tug receipt would not rise to a level of formality constituting a modification of the contract terms contained in the basic agreement between McAllister and MSTS. *See*

*Tankers and Tramps Corp. v. Tugs JANE McALLISTER, etc.,* 358 F.2d 896, 899–900 (2d Cir.1966) (intention to agree to so important a revision, without consideration, accepting responsibility for heavy damages, after the grounding had taken place, was surely not likely). Nevertheless, the tug receipt is consistent with the government contract with regard to the liability of the CALLAGHAN for the pilot's negligent handling of the vessel. It, therefore, supports the conclusion that the vessel has consented to the terms of the contract. There are authorities for the proposition that such pilotage clause exonerates McAllister of liability for negligent pilotage. *Sun Oil Co. v. Dalzell Towing Co.,* 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932); *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 93–94, 75 S.Ct. 629, 633–34, 99 L.Ed. 911 (1955) (dictum); *Transpacific Carriers Corp. v. Tug ELLEN F. McALLISTER,* 336 F.2d 371 (2d Cir.1964).

The reasoning of two recent decisions of the First and Ninth Circuits also seem applicable with regard to this allocation of liability to the vessel. In *City of Boston v. S.S. TEXACO TEXAS,* 773 F.2d 1396, 1400, n. 5 (1st Cir.1985), involving an attack on the pilotage clause on public policy grounds, the First Circuit affirmed the validity of the clause despite conflicting evidence regarding whether the clause was signed before or after the casualty. The First Circuit stated at note 5:

> If the expense of the added liability is greater than the possible economic benefit to the towing companies, the companies might conceivably refuse to allow their captains to act as docking masters, thus creating a situation whereby those most qualified would be unable to perform this service. Alternatively, as point out in Parks *The Law of Tug, Tow and Pilotage* 1068 (2nd ed. 1982): "It must be remembered that literally every ship being piloted has already procured P & I insurance insuring the liabililty of its owners third parties for negligent acts of its master crew and pilots. If the "loaned" employee status of the harbor

pilot is to be ignored then the tug company, both with respect to assisting tugs and its "loaned" harbor pilot must procure insurance in an amount equal to the full value of the largest vessel handled and her cargo. The cost of such insurance necessarily must be included in the ship assistance rates charged in which case vessel owners will be paying twice for insurance against the same risks."

The Ninth Circuit, in *Kane v. Hawaiian Independent Refinery, Inc.*, 690 F.2d 722 (9th Cir.1982) also noted that the shipowner is in the better position to obtain liability insurance for damage caused by its ship, or master or the borrowed servant voluntary pilot.

Moreover, there are substantial policy interests in permitting the parties to allocate risks among themselves, both in terms of acquisition and retention of appropriate insurance coverage and of effective management of sea-going vessels. When access to insurance is considered, it is apparent that the pilotage clause assigned risk consistently with standard coverage, since the insurance commonly carried by sea-going vessels covers accidents under pilotage. *Id.; see* A. Parks, *Law of Tug, Tow & Pilotage*, 1035 (2d ed. 1982). There is every reason, therefore, to avoid drawing fine distinctions between the relative negligence of captain and mooring master when the two are in joint control of a ship's movement.

In sum, we decline to draw such distinctions, and find that the pilotage clause effectively shifted responsibility for the mooring master's actions from HIRI to Aegean.

*Id.* at pp. 724–25.

Given the peculiarities of the time charter relationship which tends to merge the interests of the charterer, here the government, and the owners, it is not inequitable to bind the owners to a constructive awareness of the pilotage clause. In article 33(b) of the time charter party, the ship interests and the United States agreed that the government could require the ship to obtain Protection and Indemnity insurance and the government would pay the calls or premiums as was done here. The government became a named assured under the P & I policy and was discharged from its obligations contained in paragraph 33(a) of the charter party to indemnify the owners against any liability to third-parties or for damage to the vessel itself. The government also was responsible for arranging and paying for pilotage. Therefore, the government was in an appropriate position to allocate the risks between the vessel and the tug company and balance this with appropriate insurance against the liability of the vessel. Having delegated these duties through the time charter, the vessel (and its insurer) should be bound by the contracts signed on its behalf.[1]

Such a conclusion also saves from consideration McAllister's claim that the CALLAGHAN's claim was time barred by the absence from the Port of New York during the period from the date of the accident and the filing of the third party claim.

The clerk is directed to enter a judgment dismissing the third-party complaint by the CALLAGHAN on the basis of the exoneration contained in the government contract. The cross-claim filed by the third-party defendant is also dismissed as moot.

IT IS SO ORDERED.

---

1. Even if the vessel were not bound by the pilotage clause, however, the government would not be liable to indemnify McAllister since the government contract had no clause by which the government represented it was authorized to bind the vessel to the pilotage clause. *See The West Eldara, supra,* 104 F.2d at 671. The pilotage clause in the government contract is binding on the vessel by reason of apparent authority resulting from the acts of the vessel in acquiescing to the pilotage clause and not due to an express representation of authority by the government. Therefore, the government would bear no responsibility to the tug company.