TWENTIETH CENTURY DELIVERY SERVICE, Inc., a Corporation, Appellant,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Corporation, Appellee.

No. 15085.

United States Court of Appeals Ninth Circuit.

Jan. 24, 1957.

Rehearing Denied March 19, 1957.

On Petition for Modification March 19, 1957.

Gene E. Groff, Los Angeles, Cal., Russell S. Bernhard, Washington, D. C., for appellant.

Lillick, Geary, McHose, Roethke & Myers, Gordon K. Wright, Los Angeles, Cal., for appellee.

Before POPE, LEMMON and BARNES, Circuit Judges.

POPE, Circuit Judge.

On or about July 12, 1954, Calnevar Company delivered a coffee vending machine to Trans World Airlines at St. Louis, Mo., for delivery, via airfreight, to the shipper company at 1734–42 West Washington Blvd., Los Angeles, California. Trans World's airbill called for delivery at Los Angeles to the named address, and provided pick-up and delivery charges in addition to so-called "weight-rate charges" for the air transportation. Trans World had in effect a contract with the appellant, Twentieth Century Delivery Service whereby the latter undertook to perform the ground delivery services. While Twentieth Century was unloading the machine from its truck at the delivery address, it dropped the machine to the sidewalk thereby damaging it. The trial court's finding that the damage was the result of negligence on the part of Twentieth Century is not questioned on this appeal. The appellee insurance company had insured Calnevar against physical damage to its personal property, and upon receipt of proof of loss paid Calnevar $9,656.25 for the damage to the coffee vending machine, taking Calnevar's subrogation receipt therefor. It then brought this action, based upon its subrogation to the rights of Calnevar against Twentieth Century and recovered judgment for the amount so paid.

This appeal is based upon the trial court's rejection of Twentieth Century's defense that the coffee vending machine was shipped pursuant to a uniform air-

bill and covering classifications and tariffs which provided that the shipment in question was deemed to have a declared value of 50 cents per pound but not less than $50 unless a higher value was declared on the airbill at the time of receipt of freight from the shipper, and that the tariffs so providing expressly applied to, and inured to the benefit of Twentieth Century. Accordingly, since no higher value was declared and the weight of the machine was 245 pounds, Twentieth Century had tendered to the insurance company 50 cents per pound upon that weight or the sum of $122.50, which it asserted in its answer and now states was the extent of its liability.

The uniform airbill issued by Trans World Airlines, and signed by Calnevar, provided:

"It is mutually agreed that the goods herein described are accepted in apparent good order (except as noted) for transportation as specified herein, subject to governing classifications and tariffs in effect as of the date hereof which are filed in accordance with law. Said classifications and tariffs, copies of which are available for inspection by the parties hereto, are hereby incorporated into and made a part of this contract."

It also recited:

"Declared value Agreed and understood to be not more than the value stated in the governing tariffs for each pound on which charges are assessed, unless a higher value is declared and applicable charges paid thereon."

The airbill listed the contents of the shipment (a crated machine with a carton of parts), its weight, and the rate and charge for airline routing to Los Angeles. The airbill provided for both pick-up at consignor's door and delivery at consignee's street address,[1] and stated separately the charge for each. On the

---

[1]. This is indicated on the bill in the following manner: A check mark indicating that the articles were received at the consignor's door is shown in a square provided for that purpose. The portion of the airbill relating to delivery recites: "Delivery will be made to the consignee at points where delivery service is available unless otherwise specified below." Squares for checking such specifications "otherwise" are there provided so as to indicate delivery at either city terminal or at airport terminal. Neither square was checked.

airbill was a printed list of items for which charges were to be made; and the amount of each charge was typed in opposite the item on the line provided for that purpose. The list so printed and the typed amounts inserted read as follows:

| "Summary of Charges | Prepaid Charges | Collect Charges |
|---|---|---|
| Weight-Rate Charges | 40.55 | |
| Pick-up Charges | 1.20 | |
| Delivery Charges | 1.47 | |
| Excess Value Transportation Charge | . . . . | |
| Sub-Total | 43.22 | |
| Transportation Tax | 1.30 | |
| Charges Advanced | . . . . | |
| * * * | | |
| Insurance Charges | . . . . . | |
| Total Charges | 44.52" | |

Noteworthy is the fact that no charge was entered or paid for any excess value.

The governing tariffs which the airbill incorporated by reference, insofar as here relevant, were three in number: Airfreight Rules Tariff No. 1–A, C.A.B. No. 13, issued October 15, 1953; Airfreight Pick-Up and Delivery Tariff No. 3, C.A.B. No. 7 issued October 15, 1950, (showing delivery service provided at Los Angeles); and a third tariff, not in the record here, which prescribes charges other than those for pickup or delivery. This third tariff produced the "weight-rate" charges shown on the airbill. The second tariff mentioned, relating to pick-up and delivery charges, was the source of the figures inserted on the bill for those purposes. The first tariff mentioned, namely, Airfreight Rules Tariff No. 1–A, is the one primarily significant here. Paragraphs (b) and (c) of Rule 3.1 of that tariff read as follows:

"Rule No. 3.1(b) The Airbill, and the tariffs applicable to the shipment shall inure to the benefit of and be binding upon the shipper and consignee and the carriers by whom transportation is undertaken between the origin and destination, including destination on reconsignment or return of the shipment; and shall inure also to the benefit of any other person, firm or corporation performing for the carrier pick-up, delivery, or other ground service in connection with the shipment.

"(c) The Airbill, and the tariffs applicable to the shipment shall apply at all times when the shipment is being handled by or for the carrier, including air transportation by the carrier and pick-up, delivery and other ground services rendered by the carrier or any other person performing for the carrier, such pick-up, delivery or ground service in connection with the shipment."

The significant portion of these provisions is the recital that they inure to the benefit of or apply to "any other person performing for the carrier, such pick-up, delivery or ground service in connection with the shipment." [2]

Rule 3.3 of this same tariff No. 1–A provided that where the rate in part is dependent upon the value of the shipment as determined pursuant to Rule 4.3, the shipper agreed that the value of the shipment should be determined in accordance with the provisions of that rule.[3] Rule 4.3, so far as here relevant, read as follows:

---

2. It is also to be noted that the Airfreight Pick-Up and Delivery Tariff No. 3, mentioned above, recites that it is governed "by Official Airfreight Tariff No. 1, C.A.B. * * * or reissues thereof." Airfreight Rules Tariff No. 1–A is a "reissue thereof."

3. Subparagraphs a, b, and c of Rule 3.3 read as follows:
"Limit of Liability
"(a) In consideration of carrier's rate for the transportation of any shipment, which rate, in part, is dependent upon the

value of the shipment as determined pursuant to Rule 4.3, the shipper and all other parties having an interest in the shipment agree that the value of the shipment shall be determined in accordance with the provisions of Rule 4.3 and that the total liability of the carrier shall in no event exceed the value of the shipment as so determined.
"(b) By tendering the shipment to carrier for transportation, the shipper, for himself and all other parties having an interest in the shipment, waives all claims

"Charges for Declared Value

"(a) 1. A shipment shall be deemed to have a declared value of $0.50 per pound (but not less than $50.00) unless a higher value is declared on the Airbill at the time of receipt of the shipment from the shipper.

"2. * * *

"3. An additional transportation charge of $0.10 shall be required for each $100.00 (or fraction thereof) by which the value declared on the Airbill at the time of receipt of the shipment from the shipper, exceeds $0.50 per pound or $50.00 (whichever is higher).

"4. The weight used to determine the declared value of a shipment shall be the same as that which is used to determine the transportation charge for such shipment."

Congressional authorization for the filing of these tariffs with the provisions indicated is found primarily in that portion of § 483 of Title 49 U.S.C.A. which reads as follows:

"(a) Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it, and between points served by it and points served by any other air carrier or foreign air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner,

and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff so filed which is not consistent with this section and such regulations."

█ The extension of these tariffs, rules and regulations to the persons "performing for the carrier, pick-up, delivery or other ground service in connection with the shipment" referred to in tariff 1–A is, it will be noted, an exercise of the authority thus granted to classify and regulate "services in connection with such air transportation". Such authorization is manifest not only from the language just referred to but also from the fact that in the same Act which enacted § 483 Congress amended the Motor Carrier Act so as to exclude from regulation by the Interstate Commerce Commission the transportation of persons or property by motor vehicle when incidental to transportation by aircraft.[4] Congress knew, as do we, that today pick-up and delivery services are a common feature of what is offered by other types of public carriers, such as rail, motor and express. It seems hardly likely that it would be overlooked that pick-up and delivery should be an essential part of air carriage.

Pursuant to its statutory authority in this respect, the Civil Aeronautics Board promulgated its regulations relating to the tariffs to be filed by air carriers. Such tariffs were to provide for so-called "accessorial services" including pick-up and delivery; and the rules and regulations of such tariffs to contain "all of the rates or charges for and the provisions governing terminal services and all other services

for damages beyond the limitations set forth in these rules and regulations and affirms the description of the shipment as recited on the airbill, and the fact that the shipment is not of a nature unsuitable for carriage by air or hazardous thereto.

"(c) Except as provided in paragraph (e) of the Rule, the total liability of the carrier shall in no event exceed—.

1. the value of the shipment as determined pursuant to Rule 4.3 or

2. (Not applicable to DAL or UAL) the actual value of the shipment at the time and place of shipment, or

3. (Not applicable to EAL) the amount of any damages actually sustained, whichever is the least."

4. This was accomplished by the language found in § 303(b) (7a) of Title 49, which excepts from the regulation of that Commission "the transportation of persons or property by motor vehicle when incidental to transportation by aircraft."

which the carrier undertakes or holds out to perform on, for, or in connection with air transportation." [5]

In holding that the provisions of the tariff rules here quoted were ineffective to limit the liability of Twentieth Century to Calnevar, the trial court did not too clearly indicate the theory upon which it was proceeding. Its Finding XVIII was that Twentieth Century was not covered or encompassed within or by the airfreight tariff of Trans World Airlines. What we have said, mainly by way of quotation from the tariffs themselves, sufficiently shows that the quoted tariffs did purport to cover and encompass Twentieth Century; and that the Board was expressly authorized by Congress to permit and approve the filing of such tariffs.

Finding No. XIX was that: "There is no evidence that the Calnevar Company entered into any agreement with defendant Twentieth Century Delivery Service, Inc. respecting the value of said automatic coffee maker". We think that this statement, viewed either as a finding of fact, or as a conclusion of law, overlooks the essential character of the contract of the shipper. His arrangement with the carrier, as here, contemplates a single contract for shipments from the consignor's door all the way to the consignee's street number. Every part of that shipment is governed and controlled by regulatory provisions authorized by Congress and clearly stated in the approved tariffs. The statutory scheme here embodied in the Act, the regulations and the tariffs, can only be made effective if the terms and conditions relating to recoverable values are uniform from beginning to end.

It seems to us that it would be absurd to assume that the elaborate provisions made by Congress for regulation of such shipments could be permitted to result in the shipper having a new contract with new terms and varying degrees of liability each time his property was passed to a connecting carrier or delivered to a delivery service company such as the appellant. Analogous situations have arisen in respect to carriers other than air carriers, and it has been held, without exception, that provisions contained or incorporated by reference in the bill of lading issued by the initial carrier, and limiting the amount of liability for loss, extend to and operate for the benefit not only of connecting carriers, but of other persons, not carriers, performing unloading or other accessorial services connected with the shipment. In such cases it is deemed to be a circumstance wholly unimportant that the persons doing the accessorial services did not sign or execute the bill of lading, or are not named parties thereto.

In A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, certain freight, including an electric freezing unit, was shipped from New York to Cristobal in the Canal Zone, via ship, and under bill of lading subject to the provisions of the Carriage Of Goods By Sea Act, 46 U.S. C.A. § 1300 et seq. The bill of lading contained a limitation of liability to $500 per package; this limitation being authorized by the Act, 46 U.S.C.A. § 1304 (5) " * * * unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." The Act provided that carriage of goods covered the period from the time when the goods were loaded to the time when they were discharged from the ship; and it was conceded that the contract was not completed until the cargo was delivered on dock. The defendant Panama Railroad Co. was engaged by the captain of the vessel to unload the cargo at the dock at destination. The Railroad, thus acting as stevedore, dropped the freezer unit causing damages in excess of the $500 limit stated in the bill of lading. The consignee owner of the unit sued the railroad company. Plaintiff in that case took the position similar to that indicated by

5. Civil Aeronautics Board Regulations effective July 1, 1954, 14 C.F.R. §§ 221.38, 221.53 (1956 Supp.).

Finding XIX in this case, that he had made no agreement for limitation of value so far as Panama Railroad was concerned. Answering that contention, the court said, 197 F.2d at page 896:

"The controlling feature of the case is not, as appellants contend, who are the formal parties to the bill of lading. What is controlling are the terms, purpose and effect of the bill of lading as applied to the facts. The unloading of the shipment was the obligation of the carrier. In the absence of a different agreement with persons not parties thereto, the terms of the bill of lading controlled all steps of the transportation, including, or course, the discharge of the shipment. The stevedore was not a meddler, nor did it inflict intentional harm. It was an agent selected by the carrier to carry out the carrier's obligation to safely deliver and discharge the cargo as required by its contract with the shipper. The negligent injury and damage arose in the course of this very performance of the carrier's obligation. This is well stated by the trial court. That the carrier would engage such services must have been contemplated by the parties. The situation is substantially the same as if the carrier had shipped by another vessel, as authorized by the bill of lading. A stevedore so unloading, in every practical sense, does so by virtue of the bill of lading and, though not strictly speaking a party thereto, is, while liable as an agent for its own negligence, at the same time entitled to claim the limitation of liability provided by the bill of lading to the furtherance of the terms of which its operations are directed."

The views there stated were expressly adopted and approved in United States v. The South Star, 2 Cir., 210 F.2d 44. In that case certain provisions of a charter contract between the owner of a vessel and the United States as charterer of the cargo space were held to furnish a defense to the stevedore to whom had been delegated the duty of stowing the cargo. The cargo had broken loose in the hold and caused damage to the government trucks which constituted a part of the cargo. The contract signed by the owner and on behalf of the United States, provided for a one year limitation for the bringing of suit as authorized by the Carriage Of Goods By Sea Act. It was held that the limitation provisions inured to the benefit of the stevedore to whom the performance of the duty of stowage had been delegated.

In Northern Fur Co. v. Minneapolis, St. Paul & S. S. M. Ry. Co., 7 Cir., 224 F.2d 181, the fur company delivered furs of the value of over $10,000 to the Railway Express Agency for carriage to New York. The Railway Express issued its receipt on which the fur company declared a value of $2000 on the furs. The receipt contained an express provision limiting recovery for loss to the value declared and upon which the rate was based. It recited that its provisions should be binding upon the consignor and should inure to the benefit of "all carriers handling this shipment." The form of the receipt was approved by the Interstate Commerce Commission. By arrangement between the Railway Express and the defendant railway company, the furs were shipped to Minneapolis in a car furnished by the railway company and over the latter's lines. The shipment was lost due to the negligence of the railway company, and suit was brought against it by the fur company. The court held that as to such shipment the railway company was not a common carrier. It had filed no tariffs covering such transactions, and it was held not to be required to do so. It was further held that the railway company, although not a common carrier, was nevertheless a carrier within the meaning of the clause of the receipt reciting that it should inure to the benefit of "all carriers handling this shipment"; and that the defendant railway was entitled to the benefit of the limitation of liability clause notwithstanding the railroad as such had nothing to do either with the filing of the tariffs or the issuance of the receipts and had no direct dealings with the shipper.

With respect to rail carriers, it has often been held that not merely the initial carrier but the connecting carrier as well can claim the protection of a limitation of liability provision contained in the tariff of the originating carrier. Kansas City Southern Ry. Co. v. Carl, 227 U.S. 639, 648, 33 S.Ct. 391, 57 L.Ed. 683; Georgia, Fla. & Ala. Ry. Co. v. Blish Milling Co., 241 U.S. 190, 194, 36 S.Ct. 541, 60 L.Ed. 948. And see Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Dettlebach, 239 U.S. 588, 36 S.Ct. 177, 60 L.Ed. 453 (holding the limitation protected the final carrier even after the transportation terminated and it was holding the goods as warehouseman). The result reached in those cases was aided in some degree by the provisions of the Carmack Amendment, 49 U.S.C.A. § 20 which applied only to carriers by rail. However, many of the same considerations which led to the Supreme Court's conclusions with respect to the rights of connecting rail carriers to rely upon the limitations of the original bill of lading, should be equally applicable here.

In Adams Express Co. v. Croninger, 226 U.S. 491, 506, 33 S.Ct. 148, 152, 57 L.Ed. 314, it was noted that the legislation relating to rail carriers, including the Carmack Amendment, was designed to supersede all the diverse regulations and policies of the various states which theretofore might have had a bearing upon the liability of rail carriers to shippers whose shipments were to be transported in interstate commerce, the court saying: "[I]t is evident that Congress intended to adopt a uniform rule and relieve such contracts from the diverse regulation to which they had been theretofore subject." This objective was effected by the holding in the Carl and Blish cases, supra, that the terms of the bill of lading applied to the entire shipment and to the liability of any carrier which handled it from beginning to end.

■ The Civil Aeronautics Act, 49 U. S.C.A. § 401 et seq. and its provisions authorizing regulation of air carriers, and particularly the provisions heretofore alluded to, we think demonstrate a similar purpose on the part of Congress that the conditions and limitations applicable to carriage by air, should likewise apply, without variation, to any shipment from beginning to end, and in this case, from the consignor's door to the consignee's street address. To accomplish this, the provision of Rules Tariff 1–A that the liability should not exceed the value on which the rate is based, shall inure to the benefit of any person performing pickup or delivery service in connection therewith must be given effect.

■ The body of law governing all liabilities arising out of the arrangement represented by this airbill, and the shipment there called for, was within the power of Congress to enact. Here the legislative scheme has provided through statute and the regulations there authorized the extent of Twentieth Century's liability. Hence here, as was said in A. M. Collins v. Panama Ry. Co., supra, it does not matter that Twentieth Century is not a formal party to the bill of lading. For this reason it is of no importance whether as between Trans World and Twentieth Century the latter was an independent contractor, an agent, or an employee of Trans World. While it is true that the written contract with Twentieth Century referred to the latter as an independent contractor, other provisions of the writing appear to be inconsistent with such a denomination. But the whole matter is beside the point for the reason that the tariff rules and regulations expressly applied to Twentieth Century, whatever its capacity may have been. Cf. Northern Fur Co. v. Minneapolis, etc., supra, 224 F.2d at page 186.

The district court concluded that "Defendant Twentieth Century Delivery Service, Inc., cannot limit its liability for such damage by any provision contained in airfreight tariff of Trans World Airlines, Inc." This appears to be a determination that even if Twentieth Century had entered into an agreement for a limitation of its liability, or even

if the Civil Aeronautics Board accepted or approved a tariff which applied to Twentieth Century, the purported agreement or stipulation for such limitation was void. Apparently the court seems to have been of the view that one in the position of Twentieth Century cannot, under applicable rules of law, validly make a provision for the limitation of its liability such as that relied upon as a defense here. No doubt the court was also of the view that if such a contract would be void under such rules, then the Civil Aeronautics Board would have no authority to authorize tariffs incorporating such provisions for limitation of liability, since Congress cannot be taken to have intended to grant any such authority.[6]

■ With respect to this type of provision for limitation of the amount recoverable by shipper to an agreed value made for the purpose of obtaining the lower of two or more rates, it is well settled that such an arrangement is a valid one. "It has therefore become an established rule of the common law, as declared by this court in many cases, that such a carrier may, by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." Adams Express Co. v. Croninger, 226 U.S. 491, at pages 509–510, 33 S.Ct. at page 153. Such had long been the rule recognized by the Supreme Court, at least since the decision in the ruling case of Hart v. Pennsylvania Railroad Co., 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717.

Without questioning the force of the many decisions which have followed Hart v. Pennsylvania Railroad, supra, appellee asserts that they do not apply here for the protection of Twentieth Century for two reasons. The first reason, says appellee, is that the Air Freight Tariff No. 1–A applies only to the air carriage proper for which the airport to airport rate was charged; that it has no application to the wholly different contract for the delivery of the goods from the airport to the street address. The second reason given for appellee's position is that the tariffs did not provide an alternate higher charge for this delivery service in case the shipper elected to declare the higher value for his goods.

In support of these contentions appellee cites New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 73 S.Ct. 986, 990, 97 L.Ed. 1500, in which the court held that a railroad tariff limiting liability for baggage carried on passenger trains had no application in a case where a passenger's suit case was handed to a red cap for delivery to a train to which the passenger was transferring while traveling to another state. It was pointed out that in the handling of the suit case there was "no 'value declared in writing by the shipper or agreed upon in writing'," within the meaning of § 20(11) of the Interstate Commerce Act. Not even a baggage check reciting a limitation provision changed hands.

We think a very different situation exists here. The Nothnagle case plainly suggests that the situation of the carrier would have been different had the baggage in question been checked through on the passenger's fare. We have heretofore indicated our reasons for concluding that the tariff rules here involved comprehend and contemplate a single contract for a single carriage from beginning to end, that is to say, from consignor's door to consignee's street address. It is not a case of one contract for Trans World and another for Twentieth Century.

We also find no merit in the contention that to make limitation of liability valid there should have been an extra charge specified for delivery to the street address in cases where additional values were declared. For the whole transportation contracted for the shipper was

6. Cf. the comment of Judge Frank, dissenting, in Lichten v. Eastern Air Lines,

2 Cir., 189 F.2d 939, at page 944, 25 A.L.R.2d 1337.

offered the alternative stated in the tariffs in the language of Rule 4.3(a)3, supra, namely, to pay the additional charge of 10 cents for each additional $100 of declared value. It is true that this single charge of 10 cents per $100 is the only additional transportation charge provided, whether pick-up and delivery services are included in the airbill or whether they are not; nevertheless the shipper has been offered the choice between a lower and a higher rate and as between himself and Trans World the contract meets the test stated in Hart v. Pennsylvania R. Co. supra, as follows: "The distinct ground of our decision in the case at bar is that, where a contract of the kind, signed by the shipper, is fairly made, agreeing on a valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations." 112 U.S. at page 343, 5 S.Ct. at page 157.

■ Appellee's position seems to be that in order to accomplish effective limitation of liability by Twentieth Century, an additional rate should have been specified for the delivery itself in case higher values are declared.[7]

No doubt the provisions for additional transportation charges are not as symmetrical or perfectly proportioned as they would have been had an extra charge been set up and specifically named for the delivery. It is also to be noted that the charge lacks symmetry and pro-portion in other respects. Thus the added transportation charge is 10 cents per $100 whether the trip is from St. Louis to Kansas City or from St. Louis to Los Angeles, or from New York to Los Angeles. But persons who are in the business of air transportation must necessarily use a system of alternate rates which is simple enough for the shipper to understand and for the airline employee to apply.[8]

We are of the opinion that the shipper, or the appellee here, is not in a position to complain of the failure of the tariffs specifically to impose an additional charge for delivery. Whether the additional rates charged are reasonable or properly proportioned is a question primarily for the determination of the Board. In Boston & Maine R. R. v. Hooker, 233 U.S. 97, 121, 34 S.Ct. 526, 532, 58 L.Ed. 868, speaking of a regulation embraced in a rail carrier's tariff relating to limitation of liability for loss of baggage, the court said: "If the charges filed were unreasonable, the only attack that could be made upon such regulation would be by proceedings contesting their reasonableness before the Interstate Commerce Commission. While they were in force they were equally binding upon the railroad company and all passengers whose baggage was transported by carriers in interstate commerce."

In Lichten v. Eastern Air Lines, 2 Cir., 189 F.2d 939, 25 A.L.R.2d 1337, the court applied the same principle to the tariffs filed by an air carrier with the Civil Aeronautics Board. After referring to the provisions of the Civil Aeronautics Act which empowered the Board to decide whether any rate, rule, regulation or practice is unreasonable and to prescribe a lawful rate, rule, or practice, the court said, 189 F.2d at page 941:

7. As we understand the argument it is that the delivery services schedules should have specified an extra sum (for example one cent per $100), for delivery in the event of higher declared values.

8. No doubt to the average shipper the extra charge would seem to have all the practical aspects of a charge for insurance. It is a matter of which we may properly take judicial notice that companies providing insurance for airline passengers find it most practical to apply a single rate regardless of whether the trip is one way or a round trip or whether it is 100 miles or 3000 miles.

"Under these provisions, and similar provisions of other enactments, it is well settled that questions of the reasonableness of rates and practices are to be left to the administrative agency in the first instance, and that under this doctrine of 'primary jurisdiction' the provisions of a tariff properly filed with the Board and within its authority are deemed valid until rejected by it."[9]

The judgment is reversed.

#### On Petition for Modification of Opinion.

#### PER CURIAM.

Appellee has called our attention to the fact that the tender of the sum of $122.50 made to the appellee Insurance Company was in fact made by Trans World Airlines, Inc., originally a codefendant in the case, and not by appellant Twentieth Century Delivery Service, Inc., as we stated in our opinion. Accordingly we are asked to modify the opinion by correcting that misstatement and to note that in consequence the appellee was entitled to a judgment in its favor against Twentieth Century Delivery Service for the sum of $122.50. It is a fact, as appellant's petition discloses, that the answer of the appellee in the court below denied any liability whatever to the appellee.

The statement here noted that the tender was made by Trans World Airlines, Inc. rather than by Twentieth Century will serve to correct the mistake thus made in our original opinion.

It is ordered that the final sentence of the opinion be amended to read as follows: "The judgment is reversed and the cause is remanded with directions to enter judgment in favor of the appellee and against the appellant for the sum of $122.50."

We are asked to direct that the appellee also recover its costs in the dis-

trict court. We make no order with respect to such costs as in our opinion, whether in view of the fact of the tender, or whether in view of the other facts and circumstances of the case, appellant or appellee should recover its costs in the district court, is a matter within the discretion of the trial court. See Hansen v. Bradley, D.C.Md., 114 F. Supp. 382, 384. Although appellant has become the prevailing party, Rule 54(d), 28 U.S.C.A., the court may "otherwise direct" as to costs.

It is the order of the Court that the appellant shall recover from the appellee its costs in this Court.

---

9. We are not confronted here with a situation in which the carrier was charged with having imposed such a high or extortionate alternate rate for higher declared values that the shipper has been denied a reasonable or bona fide alternative for shipment under the lesser released value. See Hutchinson on Carriers, 3d Ed., § 404.