STATES MARINE CORPORATION OF
DELAWARE, a Corporation,
Appellant,

v.

VICTORY CARRIERS, INC., a Corpora-
tion, and Shipowners & Merchants Tow-
boat Co., Ltd., a Corporation, Claimant
of THE Tug, SEA SCOUT, Appellees.

SHIPOWNERS & MERCHANTS TOW-
BOAT CO., Ltd., Appellant,

v.

VICTORY CARRIERS, INC., a Corpora-
tion, Appellee.

No. 16104.

United States Court of Appeals
Ninth Circuit.

Oct. 22, 1959.

Rehearing Denied Dec. 17, 1959.

Graham, James & Rolph, Francis L. Tetreault, San Francisco, Cal., for States Marine Corp.

Derby, Cook, Quinby & Tweedt, James A. Quinby, San Francisco, Cal., for Shipowners & Merchants.

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey, Norman B. Richards, San Francisco, Cal., for appellees.

Before MATHEWS, POPE and JERTBERG, Circuit Judges.

POPE, Circuit Judge.

Victory Carriers, Inc., owner of the vessel Lewis Emery, Jr., filed a libel against the tug, Sea Scout, and the latter's owner and operator, Shipowners and Merchants Towboat Co., Ltd., claiming collision damages caused by the alleged fault of the Sea Scout and the employees of the Towboat Co., including the tug master who served as pilot on the trip.

The tug owners, commonly known as Red Stack, (and so called herein), impleaded the appellant States Marine Corporation of Delaware, to whom the Lewis Emery Jr. was time-chartered at the time of the collision, praying indemnity from States Marine for any sums Red Stack might be required to pay libelant. The decision of the trial court was that the collision was caused by the combined negligence of the pilot on the vessel (here called the Emery),[1] and of the operator of the tug. This finding is not contested. The court further decided that States Marine, in ordering the towage service furnished by Red Stack, had expressly warranted its authority to bind Victory Carriers to a pilotage clause, made a part of the order, under which Red Stack would have been free from liability to Victory Carriers for collision damage resulting from pilot negligence. Holding that Victory Carriers had not been so

bound, and hence that Red Stack must respond to Victory Carriers not merely for one half but for all of the damages to the vessel, the court decided that States Marine was liable upon its warranty to Red Stack for one half the damages. States Marine has appealed.

In the first of its two principal contentions here, States Marine argues that under the terms of its time charter Victory Carriers was precluded from exacting damages from Red Stack for injuries to its vessel from pilot negligence. This was a standard form of charter. Appellant's argument points to two clauses. One was Clause 2, which stated that the charterers "shall provide and pay for * * * Port charges, Pilotage, Agencies. * * *" At the time of the collision States Marine, under this clause, had arranged for Red Stack to move the Emery from Pier 92, San Francisco, to Oakland, and the master of the tug, Sea Scout, was on board the vessel; while the operators of the tugboat were the mate and other employees of Red Stack.

The second charter clause noted is Clause 26, which recited: "Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account." Says States Marine: In ordering the undocking service States Marine was doing only that which was authorized and required of it by Clause 2; but the loss was a loss in navigation, and of a type which Victory Carriers expressly agreed it would bear alone when it agreed to "remain responsible for the navigation of the vessel * * * same as when trading for their own account." This provision, it is claimed, protected Red Stack from liability for injury resulting from the pilot's negligence.

Victory Carriers' answer to this is that whatever may be the effect of that provi-

---

1. The master of the tug, Sea Scout, was on board the Emery, serving as pilot. The first mate was operator of the tug.

sion of the charter as between the parties thereto, it cannot operate to exonerate or render not liable Red Stack, which, says appellee, was an independent contractor which had taken over the navigation of the ship, and its duty to pilot carefully was not affected by an agreement to which it was not a party; that the clause mentioned cannot be construed to have been impliedly, or otherwise, for the benefit of Red Stack.

It is our view that this position of Victory Carriers is a correct one. The same question was presented in The West Eldara, 2 Cir., 104 F.2d 670, 671, certiorari denied McAllister Towing & Transp. Co. v. American D. Lines, 308 U.S. 607, 60 S.Ct. 144, 84 L.Ed. 507, where the court said: "Under this time charter which was not a demise, it is clear that the navigation of the vessel was the responsibility of the owner rather than that of the charterer. As between those two the acts or omissions of the tug boat captain while in charge of the vessel would be the acts or omissions of the owner even though he had been put in control by the charterer by virtue of its right to do so in accordance with the terms of clause 2 of the charter. \* \* \*

"The error in the former opinion which led to an erroneous result lay in the extension of the above principle beyond the owner-charterer relationship so as to control in respect to liability as between the owner and third persons. Bramble v. Culmer, 4 Cir., 78 F. 497, on which special reliance was placed, did

not go so far nor did the other cases cited.

"On the contrary, in the absence of any special contract provisions like those in the pilotage clause which are not here binding upon the owner, one who is under contract to dock or undock a vessel is responsible as principal to the owner of the ship for the negligence of the agent whom the contractor places on the ship in charge of the operation." [2]

We agree with what is there stated. In Robert C. Herd & Co. v. Krawill Machinery Corp., 1959, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820, it was held that a provision of the shipowner's bill of lading which limited its liability to $500 per package, but which did not refer to the stevedoring contractor (which dropped a crated machine into the harbor while attempting to load it on ship), was not designed for the benefit of any one except the shipowner and did not operate to limit the liability of the negligent stevedoring contractor to the cargo owner.

That decision disposes of a substantial portion of the argument presented by appellant in support of its claim that Clause 26 not only relieves the charterer of responsibility for navigation of the vessel, but operates to extend that immunity to the subcontractor or agent to whom a portion of the performance has been delegated. The meaning of the Herd case is that no such conclusion can be drawn from facts such as those here. 359 U.S. at page 303, 79 S.Ct. at page 770.[3]

**2.** In his dissenting opinion in Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 198 F.2d 369, 374, Judge Clark suggests that the majority opinion in that case runs counter to The West Eldara. As we read that decision we think it does not; that it is not apposite here. In fact, the majority opinion does not even mention The West Eldara, which, in view of the dissent, it could not have overlooked. The decision in the Logue Stevedoring case turned on a procedural point which prevented a judgment against the tug owners or operators. The libel was *in rem* against the tug and the vessel being moved. Libellant was owner of two derricks which were damaged when struck

by the vessel, The Alston, during an undocking operation. The captain of one of the tugs was on the vessel as undocking pilot. Dalzell Towing Company was not a party to the suit. Lloyd H. Dalzell was claimant of the tugs. The court held this did not give the court jurisdiction over him. It did not appear that the captain *acting as pilot* was Dalzell's employee, nor what relation Dalzell had to the Towing Company, or who were operators of the tugs. Hence the court held judgment against Dalzell could not stand.

**3.** "From its early history this Court has consistently held that an agent is liable for all damages caused by his negligence, unless exonerated therefrom, in whole or

Appellant relies strongly on the case of Elder, Dempster & Co. Ltd. v. Paterson, Aochonis & Co., Ltd., [1924] A.C. 522. The Herd case, 359 U.S. at page 307, 79 S.Ct. at page 772, considered a similar contention as to that case, and held that this question "was not involved in or decided by that case."[4]

It is contended that notwithstanding its decision in the Herd case, the Supreme Court would hold that the language here involved: "The owners to remain responsible for the navigation * * * same as when trading for their own account," protects the towboat company. As we understand appellant's argument on this point, it is that this provision was inserted to immunize States Marine; that now to hold that Red Stack is liable for pilot negligence, and then permit recovery over, as in this case, against States Marine, frustrates the primary purpose of Clause 26. Says appellant: "Not only the wording of the time charter itself but the very existence of the present litigation make clear that the contractual undertaking of the shipowner, Victory Carriers, to remain responsible for navigation must extend not only to States Marine but to Red Stack to assure States Marine itself of the benefit of such provision."

A similar argument was rejected in Brady v. Roosevelt S.S. Co., 317 U.S. 575, 582, 63 S.Ct. 425, 87 L.Ed. 471. This argument of appellant assumes that the time charter, when drawn, contemplated and had in view an indemnity-warranty agreement such as that here enforced against States Marine. That assumption is not warranted. The parties are not shown to have anticipated Red Stack's special warranty requirement, or that they even anticipated dealing with Red Stack, or entering its port.

A like point was made in the Herd case when it was in the Court of Appeals. That court said, 256 F.2d at pages 950, 951: "The extent of the latter's liability was apparently not in contemplation in the drafting of the statute, or the bill of lading to which it was not a party. * * If there were a contrary intent, nothing would have been easier than to say in the statute or in the bill of lading that the limitation applies to the ship, its owners, and loading agents." So here, if Red Stack's required warranty had been in contemplation when the charter was executed, nothing would have been easier than to say in it that the charterer's immunity from responsibility for navigation applies to the charterer and any towage or pilotage company whom the charterer might engage pursuant to Clause 2.

Since nothing in the charter, or in the relationships or situations of the parties generally bars the owner from recovery from the tug company, the ordinary rule must be applied, namely, that the tug company is liable to the vessel owner for the negligence of the pilot who was in the employ of the tug company. Sturgis v. Boyer, 24 How. 110, 122, 123, 16 L.Ed. 591; Robins Dry Dock & Repair Co. v. Navigazione L. Triestina, 261 N.Y. 455, 185 N.E. 698.

in part, by a statute or a valid contract binding on the person damaged." In Publicker Industries v. Tugboat Neptune Co., 3 Cir., 171 F.2d 48, the pilotage clause relied on by the tugboat company to exonerate it was not binding on the plaintiff who was not a party to it. Hence the tugboat company was held liable.

In the court below appellant relied strongly upon A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, 897, and a statement in the Restatement on Agency that "An agent who is acting in pursuance of his authority has such immunities of the principal as are not personal to the principal." In Herd the Court rejected the application of any such rule, and expressly disapproved the A. M. Collins & Co. case.

4. Our decision in Twentieth Century Delivery Services v. St. Paul Fire & M. Ins. Co., 9 Cir., 242 F.2d 292, at page 295 is plainly distinguishable. There we noted that the tariffs which authorized the limitation of liability of the carrier expressly provided that they should inure "to the benefit of any other person, firm or corporation performing for the carrier pick-up, delivery, or other ground service in connection with the shipment."

States Marine next contends that the trial court should have held that the owner of the Emery was actually bound by a pilotage clause which was prepared by Red Stack. This provided that when a pilot, such as the tug's master, went aboard the Emery, "such pilot becomes the servant of that vessel," and that Red Stack should in such cases not be liable for actions taken or decisions made by him.[5] Hence, says appellant, there was no basis for holding States Marine on the warranty of authority which the court held it had undertaken.

That warranty of authority arose from a paragraph inserted in a notice given by the Red Stack concerning the conditions which it would insist upon before undertaking to provide tugs and a pilot. The notice was that it required the person ordering such services to agree to a pilotage clause to the effect stated above, and it further provided in the paragraph just mentioned: "If any such vessel is not owned by the person or company ordering the tug and/or piloting service, it is understood and agreed that such person or company warrants its authority to bind the vessel and her owners to all the provisions of the preceding paragraph and agrees to indemnify and hold harmless this company and such pilot and any assisting tug, its owners, agents, charterers operators or managers, and each of them, with respect to all losses, damages and/or expenses that may be suffered or incurred in consequence of such person or company not having such authority."

The trial court found that when States Marine ordered the tug service it knew that Red Stack would undertake such service only under condition that the contract of hire included the pilotage clause, and in ordering that service States Marine accepted the pilotage clause, including the stated warranty in the quoted language, and became bound thereby; further, that Victory Carriers had no part in requesting the towage service, and that it did not become bound by the pilotage clause. Hence it was held that Red Stack had suffered damage. Had it been so bound, it would have been restricted to a one-half damage recovery against Red Stack; since it was not bound, it recovered full damages. Hence the damage to Red Stack from States Marine's breach of warranty was a sum equal to half the amount it must pay Victory Carriers.

States Marine is now arguing that there was no breach of warranty because Victory Carriers actually did become bound by the pilotage clause. This is true, it says, because States Marine had implied authority to, and did in fact, bind Victory Carriers to the pilotage clause. The finding of the court was precisely to the contrary.[6] Viewed as a finding of fact, this cannot be held to be clearly erroneous. When Red Stack prepared the letter containing the pilotage clause, plus the warranty paragraph, here referred to, it mailed copies to a long list of steamship companies and other persons. Victory Carriers was not

5. "When any pilot furnished by this company, including the master or other officer of any tug furnished to or engaged in the service of assisting or towing a self-propelled vessel, goes on board such vessel, whether or not the vessel has available for use or is making use of her own propelling power, it is understood and agreed that such pilot becomes the servant of that vessel and her owners in respect of all actions taken, orders given, or decisions made by him (or any omission thereof) while on board such vessel; and it is furthermore understood and agreed: (1) that the vessel and her owners will assume all liability for any loss or damage (including that suffered by any assisting tug) resulting from or arising out of the negligence or other fault of such pilot; (2) that neither this company nor such pilot nor any assisting tug, its owners, agents, charterers, operators or managers shall be liable, directly or by way of indemnity or otherwise, for any such loss or damage; * * *"

6. "In dealing with Shipowners & Merchants, States Marine was not authorized to, and did not bind Victory Carriers to the terms of the pilotage clause and Victory Carriers was not contractually bound thereby."

on that list. There was no evidence that Victory Carriers, or the Master of the Emery, had any part in requesting the towage service; nor was there evidence that such clauses are either universally required, or even customary.

No case has been cited by appellant holding that under any similar state of facts a provision such as that stated in Clause 2 of the charter, that charterer shall "provide and pay for" pilotages, means that the charterer, in doing so either (1) does so as an agent of the owner, or (2) has any implied authority to bind the owner upon such a pilotage clause. All cases which have discussed that question have stated the rule to be contrary to appellant's contention. The West Eldara, supra; [7] The Niels R. Finsen, D.C.S.D.N.Y., 52 F.2d 795, 799; [8] People of State of California v. The Jules Fribourg, D.C.N.D.Cal., 140 F.Supp. 333, 340.[9] Appellant argues that the statements made in these cases were unnecessary to those decisions. We are inclined to doubt that but whether they were or not, we think they are sound statements with which we are in agreement, particularly since there is no authority to the contrary. The finding and conclusion of the trial court on this point must be affirmed.

■ The letter containing the pilotage clause was dated May 4, 1956. Although States Marine admits it received a copy of this letter, it argues that this was not the arrangement to which it agreed since Red Stack continued to send out invoices for services on the bottom of which was printed a different pilotage clause not containing any warranty provisions.

States Marine was an impleaded respondent in The Jules Fribourg case, supra, where one reason why it escaped liability was that the pilotage clause contained no such warranty. Since it must have known that the paragraph added to the May 4, 1956 letter was intended to meet that situation, the finding of the trial court that in dealing with States Marine, Red Stack relied upon the warranty of authority in the pilotage clause, and that this clause was a part of the contract with States Marine, is plainly supported by the evidence. The fact that other more limited language appeared on the invoices does not require a different conclusion.

■ Finally, States Marine contends that if Victory Carriers had been bound by the pilotage clause, it could nevertheless have recovered full damages from Red Stack. Hence, it is argued, there is no basis for a claim for indemnity against States Marine,—the failure to bind Victory Carriers made no difference.

If the pilotage clause had been accepted or authorized by Victory Carriers, its validity could not be questioned. Sun

---

7. "Upon the facts as stated in the previous opinion, The West Eldara, 2 Cir., 101 F. 2d 45, with which familiarity is now assumed, we held that the pilotage clause was not binding upon the ship owner. This is so because the charterer was not the agent of the owner in contracting with the towing company to dock the vessel." 104 F.2d at page 670.

8. "If, on the other hand, the pilotage clause were to be held binding on the owners, this could be only on the assumption that the clause was such a customary one or even such a universal one in towing work in New York Harbor that the owners, by stipulating that the charterer should provide pilotage, consented to have their ordinary rights abridged by the pilotage clause."

9. "But, the charterer in dealing with the tug company did not act as the owner's agent. The charterer had the authority to provide for pilotage, but whatever undertaking it entered into in doing so was its own responsibility. It is not reasonable to imply from the charterer's authority to provide a pilot, the incidental authority either to waive any rights of the owner or to subject the owner to an employer's responsibility for the actions of a person who in fact was controlled by and owed primary allegiance to another employer. The implication of such authority would not be justified even if, as the tug company contends, the owner of the Jules Fribourg was aware that pilotage clauses such as the present one were in frequent use."

Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311.[10] As noted in Sun Oil, where the damage resulted solely from pilot error, the result of such a pilotage clause was that there could be no recovery from the towing company. Here, where the fault was both that of the pilot and that of the tug, the consequence must be that the owner's recovery be reduced to one-half the damages. Such would be the result in any case of mutual faults where the owner's own employees were in charge of the ship. Great Lakes Towing Co. v. American S.S. Co., 6 Cir., 165 F.2d 368.

The limitation of recovery to one-half, if the pilotage clause had bound Victory Carriers, would be an application of an established admiralty doctrine. "Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties. This maritime rule is of ancient origin and has been applied in many cases * * *." Halcyon Lines v. Haenn Ship, etc., Corp., 342 U.S. 282, 284, 72 S.Ct. 277, 279, 96 L.Ed. 318, citing The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91, and other cases. Where, as here, the damage is to the one vessel, half damages are recovered. Cf. The Schooner Catherine v. Dickinson, 17 How. 170, 58 U.S. 170, 15 L.Ed. 233.[11]

We note the precise language of the pilotage clause (note 5, supra). After reciting that "such pilot becomes the servant of that vessel and her owners" it states that it is agreed: "(1) that the vessel and her owners will assume all liability for any loss or damage (including that suffered by any assisting tug) resulting from or arising out of the negligence or other fault of such pilot; (2) *that neither this company nor such pilot nor any assisting tug, its owners, agents, charterers, operators or managers shall be liable, directly or by way of indemnity or otherwise, for any such loss or damage; * * *"* (Emphasis added.) We perceive no reason why this italicized language should not be given full effect. It is purely exculpatory. Giving it effect, as drawn, would not involve any holding that injured third parties could hold the owners liable for damages to them. The tug owners are not seeking to use the pilotage clause to make the ship owners liable for damage to a tug. Cf. United States v. Nielson, 349 U.S. 129, 75 S.Ct. 654. We hold that acceptance of the clause by Victory Carriers would have had the effect of relieving Red Stack of half the damages.

Appellant's argument that Red Stack would still be liable for all the damages because of its own separate negligence seems to be based upon an attempted application of the case of the Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801. That case is not relevant here. It dealt with the damages recoverable by the innocent owners of cargo lost in a mutual fault collision. A ship owner bound by this pilotage clause, where the pilot was at fault, would hardly be in the

10. "Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, involved the meaning and validity of a pilotage contract substantially the same as the one here. One of Dalzell's tug captains negligently piloted Sun Oil's vessel causing the boat to ground and suffer damages. Sun Oil sued Dalzell. The contract exempting Dalzell from liability for pilotage was pleaded as a defense. This Court held that the tug company could validly contract against being 'liable for any damage' caused by the negligence of one of its captains in piloting Sun Oil's vessel and construed the contract there as having

that effect." United States v. Nielson, 349 U.S. 129, 131, 75 S.Ct. 654, 656, 99 L.Ed. 939.

11. "If only one party sues and the other merely defends the suit, and upon the proofs it appears that both parties are in fault, the court declares this fact in the decree, and decrees to the libellant one-half of the damage sustained by him; the damage sustained by the respondent not being regarded as the subject of investigation determinable in that suit." The North Star, 106 U.S. 17, at page 22, 1 S. Ct. at page 46.

position of the cargo owners in that case, who were completely without either fault or control of any kind.

The judgment of the district court is affirmed.